UNITED STATES of America ex rel.
Stanley B. HOSS

v.

Julius T. CUYLER, Individually and as Superintendent of the State Correctional Institution at Graterford, his Agents and Successors in Interest, Robert N. Mauger, Individually, as Acting Deputy Superintendent of Custody and as a member of the Program Review Committee of the State Correctional Institution at Graterford, Pennsylvania, his Agents and Successors in Interest, Daniel T. Sims, Individually, as Deputy Superintendent for Treatment, and as a member of the Program Review Committee of the State Correctional Institution at Graterford, Pennsylvania, his Agents and Successors in Interest, Lawrence Reid, Individually, as Director of Treatment, and as a member of the Program Review Committee of the State Correctional Institution at Graterford, Pennsylvania, his Agents and Successors in Interest, and William B. Robinson, Individually and as Commissioner of Corrections, his Agents and Successors in Interest, Camp Hill, Pennsylvania.

Civ. A. No. 74–2148.

United States District Court,
E. D. Pennsylvania.

May 1, 1978.

James A. Backstrom, Jr., Roy G. Rifkin, H. Vincent McKnight, Jr., Student Counsel, Indigent Prisoner Litigation Program, Philadelphia, Pa., for plaintiff.

Maria P. Vickers, Asst. Atty. Gen., Philadelphia, Pa., for defendants (in their official capacities).

Joseph Goldberg, Philadelphia, Pa., for defendants (in their unofficial capacities).

## SUR PLEADINGS AND PROOF

LUONGO, District Judge.

This action under the Civil Rights Act of 1871 was instituted by Stanley B. Hoss to redress alleged deprivations of his civil rights during his confinement at the State Correctional Institution at Graterford. Hoss contends that he has been subjected to cruel and unusual punishment and deprived of liberty without due process of law. The case was tried to the Court, sitting at Graterford, on June 1, 1976. Since that time, the parties have unsuccessfully attempted to settle the case. In addition, decision has been deferred to allow completion of psychiatric evaluations of Hoss which were conducted pursuant to an order of this Court. In the interim, counsel have supplemented the record with various documents. Now that the record is complete, I make the following

## FINDINGS OF FACT

A. *The Parties*

1. Plaintiff is Stanley Barton Hoss, an inmate of the State Correctional Institution at Graterford, Pennsylvania (SCI Graterford), who is confined to that institution's Behavior Adjustment Unit (BAU).

2. Defendant Julius T. Cuyler is the Superintendent of SCI Graterford.

3. Defendant Robert N. Mauger is one of the two majors of the guard at SCI Graterford. From October 1975 to May 1976 he served as acting Deputy Superintendent for Operations at the institution, replacing Deputy Superintendent T. J. Meisberger, who was on sick leave.

4. Defendant Daniel T. Sims is the Deputy Superintendent for Treatment Services at SCI Graterford.

5. Defendant Lawrence Reid is Director of Treatment Services at SCI Graterford.

6. Defendant William B. Robinson is the Pennsylvania Commissioner of Correction.

B. *Description of Hoss*

7. Hoss was born March 1, 1943.

8. To keep in good physical condition, Hoss practices a demanding daily physical fitness regimen, including 1000 push-ups, 600 "dips," 600 sit-ups, and karate exercises. To develop his hands, he hits the cement wall of his cell daily.

9. According to the testimony and medical reports of psychiatrists, Hoss is not psychotic, although he does have a personality disorder known as "passive-aggressive personality." The term "passive-aggressive personality" was not defined at trial; Stedman's Medical Dictionary (4th unabr. lawyers' ed. 1976) defines it as follows on page 1061:

"a personality disorder in which aggressive feelings are manifested in passive ways, especially through mild obstructionism and stubbornness."

The SCI Graterford staff psychiatrist described Hoss' personality as "severely passive-aggressive or explosive."

10. Hoss is Caucasian. He frequently uses the epithet "nigger" in referring disparagingly to other persons. At trial, he explained that he does not use this word in a racial sense as a label for black persons; instead, he uses it as a derogatory name for any person—black or white—who does not treat him fairly or with respect.

C. *History of Hoss' Incarceration Prior to His Transfer to SCI Graterford*

11. On March 9, 1970, Hoss was convicted of first degree murder in the Court of Common Pleas of Allegheny County, Pennsylvania, and was sentenced to death. On October 25, 1972, the death sentence was vacated and Hoss was sentenced to life imprisonment.

12. Until 1973, Hoss was incarcerated at the State Correctional Institution at Pittsburgh (SCI Pittsburgh).*

* Some of the testimony and exhibits referred to SCI Pittsburgh by its old name, Western State Penitentiary. The name was changed in 1959. *See* Act of Oct. 22, 1959, Act No. 467, § 1, 1959 Pa.Laws 1356, 1357, *amending* Administrative

Code of 1929, § 202, 71 Pa.Stat.Ann. § 62 (Purdon).

13. On August 16, 1972, Hoss was implicated in the stabbing of a black inmate, Eugene Spruill, at SCI Pittsburgh. Immediately prior to the stabbing, Hoss had been in a "pre-release range" of the prison where he worked in the prison laundry and was locked up only from 3:00 p. m. to 6:00 a. m. As a result of the stabbing he was placed in SCI Pittsburgh's BAU, where he did not have these privileges.

14. On September 10, 1972, SCI Pittsburgh officials found Hoss guilty of misconduct in refusing to move to another cell and in threatening an officer.

15. On December 10, 1973, Hoss (who was confined to the BAU) and other SCI Pittsburgh inmates assaulted and killed Walter Peterson, a black prison guard.*: For that slaying, Hoss was convicted on June 13, 1974 of second degree murder in the Court of Common Pleas of Allegheny County, Pennsylvania, and was sentenced to a further prison term of ten to twenty years.

* The slaying was accomplished in an especially brutal manner. See Commonwealth v. Hoss, 469 Pa. 195, 197–98, 364 A.2d 1335, 1336 (1976).

16. Two days after the killing of Peterson, Hoss was transferred to the State Correctional Institution at Huntingdon (SCI Huntingdon), where he was kept for the duration of the Peterson murder trial. After that trial, on June 19, 1974, Hoss was transferred from SCI Huntingdon to SCI Graterford. Throughout the period of his incarceration at SCI Huntingdon, Hoss was held in that prison's BAU.

D. *Description of SCI Graterford and its Procedural Regulations*

17. SCI Graterford is a part of the Pennsylvania prison system. It is under the supervision, management, and control of a board of trustees, a departmental administrative board within the Pennsylvania Department of Justice, and of the Bureau of Correction, a part of the Department of Justice headed by the Commissioner of Correction.*

* See Administrative Code of 1929, §§ 202, 911–916, 71 Pa.Stat.Ann. §§ 62, 301–306 (Purdon); Penal and Correctional Institutions Act of 1953, §§ 1–4, 71 Pa.Stat.Ann. §§ 831–834 (Purdon). These facts were not adduced at trial. They are established by the statutes cited, of which I take judicial notice. See Fed.R.Evid. 201.

18. At the time of trial, the inmate population of SCI Graterford was 1725, of which only about 200 were white. Although these figures are constantly changing, the ratio of black to white inmates at SCI Graterford remains high.

19. At the time of trial, SCI Graterford had 279 correctional officers, including guards. The guards work eight hour shifts and are divided into nine squads; two squads work during each shift.

20. Some of the administrative personnel at SCI Graterford, including defendants Cuyler, Sims, and Reid, are black.

21. The chief administrative officer at SCI Graterford is the superintendent. From the time of Hoss' arrival at SCI Graterford in June 1974 to the date of trial, the institution had three superintendents—Robert L. Johnson, who left a few days after Hoss' arrival; Ronald Marks, who served from the time Johnson left until early 1975; and defendant Cuyler, who became superintendent in early 1975.

22. SCI Graterford is administered in accordance with administrative regulations issued by the Commissioner of Correction, including Bureau of Correction Administrative Directive No. 801, which deals with prison disciplinary procedures and restricted housing categories. That Directive became effective on June 1, 1974 and was amended in several significant respects on February 12, 1977.* As amended, ¶ 1 of the Directive [to be codified at 37 Pa.Code § 95.101] sets forth its "Scope and Purpose" as follows:

"Institutional life shall be governed by standards of behavior designed to promote correctional objectives and to maintain the general welfare of the institutional community. The laws of this Commonwealth and the rules and regulations of the Bureau of Correction and of the institution are a part of the standards of behavior governing each institution.

Behavior which deviates from such standards shall be handled by staff in the manner prescribed by this directive. Such behavior shall be evaluated within the context of the total treatment plan of the individuals, the effect of such behavior upon others and its consequences for the good order of the entire institution. The methods used by staff shall be for the purpose of bringing about voluntary compliance with the standards prescribed. Sanctions shall be imposed only when necessary and in the degree necessary to regulate the unacceptable behavior."

* A copy of the original (1974) version of the Directive was submitted at trial as Exhibit P-1; the 1977 amended version was forwarded to the Court by counsel as part of their supplementation of the record. The Directive is divided into various paragraphs and subparagraphs, some of which are numbered differently in the original and amended versions, and will be cited accordingly. Although the original Directive was never made part of the Pennsylvania Code (*see* note 16, *infra*), the 1977 amended version will be incorporated into Title 37 of that codification as an amendment to §§ 95.101 to 95.108. In citing to paragraphs of the amended Directive, I have provided cross-references to the corresponding prospective section number in Title 37 in brackets.

23. Administrative Directive No. 801 sets forth a fairly comprehensive procedure for the handling of prisoners' misconducts. It provides that "expectations and prohibitions" applicable to inmates of all institutions under the Bureau of Correction's supervision are to be defined by administrative directives issued by the Attorney General and Commissioner of Correction and by regulations comporting with these directives issued by the superintendent of each institution upon approval of the Commissioner of Correction. (¶ II.A. [§ 95.102]) It provides guidelines for the classification of misconducts into two categories—"major" or "class 1" (ranging from murder to refusal to obey an order and repeated violations of minor misconduct prohibitions) and "minor" or "class 2" (ranging from simple assault or "body punching" to tatooing and failure to report for work). (¶ II.B. [§ 95.-102.1]) As amended, the Directive provides that all misconduct charges must be heard by a Hearing Committee consisting of a major or captain of the guard (the committee chairman), a casework supervisor, and a school or vocational supervisor. Inmates charged with misconduct are entitled to written notice, a hearing, an explanation of the committee's decision during a personal appearance of the inmate before it, and formal review by another body known as the Program Review Committee. (Amended Directive, ¶ III [§ 95.103]) The original version of the Directive mandated similar procedures, except that it provided for somewhat less formal disposition of minor misconduct charges (original Directive, ¶ III.D.).

24. Administrative Directive No. 801 authorizes a variety of disciplinary measures for dealing with prisoners' misconducts. For major misconducts, one of the actions authorized is a change of the prisoner's housing from that used for the general prison population—*i. e.,* those inmates "who do not require special physical measures for the control of behavior" (original Directive ¶ V.A.)—to a more restricted housing area. (Original Directive, ¶ III.H.5; amended Directive, ¶ III.F. second 3. [§ 95.103(f) (second 3)]) The original version of the Directive authorizes two restrictive housing categories for such use: "Administrative Custody" and the "Behavior Adjustment Unit" (BAU); as amended, it authorizes "placement in Close or Maximum Disciplinary Custody." The amended Directive provides that placement in disciplinary custody "will have a specified maximum duration for each misconduct not to exceed six months."

25. In addition to authorizing use of the more restrictive housing categories to discipline prisoners who committed misconducts, Administrative Directive No. 801 authorizes use of restrictive housing for behavioral control in situations in which a hearing has not been held. Paragraph IV.B. of the original Directive provided:

"1. A resident who has allegedly committed a major misconduct shall be placed in the Behavior Adjustment Unit upon approval of the officer in charge of the institution pending application of procedures under Para-

graph III [specifying procedures for dealing with prisoners' misconduct].

2. A resident who has allegedly committed a minor misconduct may be confined as follows:

a. Depending upon the situation, and the need for control, a resident may immediately be removed from his job, restricted in activities and/or confined to his own cell upon approval of the officer in charge of the institution pending the application of procedures under Paragraph III.

b. A resident who poses a clear and present danger to himself, others, or property, may be placed in Administrative Custody or the Behavior Adjustment Unit on a temporary basis upon approval of the officer in charge of the institution pending the application of procedures under Paragraph III or until such time as he can be safely removed.

3. A resident may be temporarily confined to any of the above units in an investigative status upon approval of the officer in charge of the institution where it has been determined there is a threat of a serious disturbance or a serious threat to the individual or others. An investigation shall begin immediately to determine whether or not a behavior violation has occurred.

4. If the above conditions do not exist, the resident shall not be so confined unless such confinement is determined by the disposition of the case in accordance with Paragraph III."

Clauses 1. and 2.a. of the paragraph have been included in ¶ IV.B. of the amended Directive [§ 95.104(b)] with the one significant change that "Close or Maximum Administrative Custody" has been substituted for "Behavior Adjustment Unit." As amended, the paragraph does not contain clause 2.b. and has the following revised clauses 3. and 4.:

"3. An inmate may be temporarily confined to either of the above units in an investigative status upon approval of the officer in charge of the institution where it has been determined there is a threat of a serious disturbance, or a serious threat to the individual or others. The inmate shall be notified in writing as soon as possible that he is under investigation and that he will receive a hearing if any disciplinary action is being considered after the investigation is completed. An investigation shall begin immediately to determine whether or not a behavior violation has occurred. If no behavior violation has occurred, the inmate must be released as soon as the reason for the security concern has abated but in all cases within ten (10) days.

4. An inmate who requests self-confinement may be placed in Close or Maximum Administrative Custody upon approval of the officer in charge of the institution pending review by the Program Review Committee. The Program Review Committee shall document the request by the inmate as well as the reasons for the request and shall determine whether Close or Maximum Administrative Custody is warranted by a review of the reasons and whether continuing confinement is justified or whether a transfer should be recommended."

26. The general prison population at SCI Graterford is housed in five cell blocks of 400 cells each. The population of each cell block ranges from 360 to 290. Five correctional officers are assigned to each cell block.

27. The original version of Administrative Directive No. 801, ¶ V.B., described authorized use of the "Administrative Custody" housing category as follows:

"for residents requiring closer supervision or protection than is provided in the general population and for temporary assignment of residents pending further classification."

This housing category was only slightly more restrictive than that used for the general prison population, and ¶ VI.A.1. of the original Directive specified that residents in it would "have all rights and privileges accorded the general population except for curtailment of freedom to move about the institution and engage in programs with the general population." At SCI Graterford, prisoners in this housing category have been housed in "B Gallery" a group of fifty cells on the second tier of the "B" cell block. Most of the B Gallery residents have been placed there for reasons of their own protection rather than for prison security. B Gallery residents have been allowed to mingle with each other during meals, exercise periods, and other times throughout the day.

28. The original version of Administrative Directive No. 801, ¶ V.C., described authorized use of the BAU as follows:

"for residents found by the Hearing Committee/Program Review Committee in accordance with the procedures established in this directive to have committed major misconducts and/or for residents who require close custody for the protection of themselves and others as provided under IV.B."

The BAU was the most restrictive housing category for those prisoners not subject to confinement in Psychiatric Quarters. Paragraph VI.B. of the original Directive imposed the following requirements with regard to the BAU:

"The Behavior Adjustment Unit shall be in a separate cell-block or building of the institution providing close custody.

1. The purpose of placing a resident in this unit shall be to closely supervise, control and treat problematic behavior of a serious nature.

2. Residents confined thereto shall have all the rights and privileges accorded the general population except for freedom to move about the institution, to engage in programs with the general population, or the use of individual radios and televisions. However, the use of the latter items may

be permitted with the express approval of the Hearing Committee/Program Review Committee. Any privilege may be curtailed at the express discretion of the Hearing Committee/Program Review Committee."

At SCI Graterford, the BAU is a separate building located at a distance of three or four city blocks from the main prison building. The BAU has a capacity to house 39 prisoners, but the most ever kept there is 34, and at the time of trial only 22 or 23 prisoners were housed there. BAU residents are kept segregated from each other and are confined to their own cells throughout the day except for a daily period of recreation outside the cells and an opportunity to use the showers, which are in a separate section of the BAU. The cells are eight feet wide, ten feet long, and nine feet high. In accordance with the discretion allowed by ¶ VI.B.2. of the original version of Administrative Directive No. 801, the residents have had access to a radio. At the time of trial, they did not have access to a television because of insufficient electricity in the BAU building, but since then the prison has installed electrical facilities for television in the part of the BAU in which Hoss is housed. BAU residents are allowed a maximum of three visits per month, and each visit may last no longer than one hour. The BAU residents are under close supervision of prison correctional officers; four officers are stationed in the BAU from 6:00 a. m. to 6:00 p. m., and two officers are stationed there from 6:00 p. m. to 6:00 a. m. Because the BAU provides isolation from other inmates, some SCI Graterford prisoners have requested BAU confinement for self protection.

29. The original version of Administrative Directive No. 801 authorized use of Administrative Custody and the BAU for both administrative and disciplinary reasons. The 1977 amendments changed the terminology applied to the restrictive housing categories, authorizing the establishment of "Administrative Custody" and "Disciplinary Custody," each of which is to contain two confinement levels, "close" and

"maximum." (Amended Directive ¶ V [§ 95.106])

30. The amended version of Administrative Directive No. 801, ¶ V.A. [§ 95.106(1)], describes authorized use of the "Administrative Custody" housing category in the same manner as that in ¶ V.B. of the original Directive. Unlike the original Directive, however, the amended version does not authorize use of Administrative Custody as a disciplinary measure. Paragraph VI.A. of the amended Directive [§ 95.107 (a)*] provides, in part:

"1. The purpose of placing an inmate in this unit shall be to maintain the safety of the institution by segregating an individual who poses a threat to other inmates, to staff or to himself, poses an escape risk or needs protection from other inmates. The decision to place an inmate in this custody must comply with [paragraphs] III.G.4., IV.B.1., IV.B.3., or IV.B.4. . . .

2. The inmates therein shall have all the rights and privileges accorded to the general population except for freedom to move about the institution, freedom to engage in programs with the general population, the use of civilian clothing, and the use of items specifically found by the Program Review Committee to be a security hazard. The use of personal radios and televisions may be permitted with the express approval of the Program Review Committee. All other personal property which is permitted in general population will be permitted in Administrative Custody."

The paragraph also authorizes institution of "a limited release program from Close Administrative Custody as a gradual process to return to general population status." (Amended Directive, ¶ VI.A.4. [§ 95.-107(a)(4)])

* As published at 6 Pa.Bull. 3161, 3165 (1976), § 95.107(a)(2) differs from the quoted version of ¶ VI.A.2. with respect to matters not material to this litigation.

31. Paragraph V.B. of the amended Directive [§ 95.106(2)] authorizes use of Disciplinary Custody "for inmates found by the Hearing Committee to have committed Class 1 [major] Misconducts." Paragraph VI.B. [§ 95.107(b)] provides:

"Disciplinary Custody housing . . . will be specified groups of cells in a designated section or sections of the institution as the physical plant permits.

. . . . .

1. The purpose of placing an inmate in this unit shall be to supervise and control serious disciplinary problems.

2. Inmates confined therein shall not be permitted freedom to move about the institution or to engage in programs with the general population. Inmates in this confinement will be permitted those items, or use of those items, necessary to maintain an adequate level of personal hygiene as well as a reasonable amount of personal legal materials and correspondence. Inmates in this unit will also be permitted to visit with their approved visitors consistent with institutional and Bureau regulations, to correspond consistent with Bureau Directives and will be issued those items not already possessed by the inmate necessary to maintain personal hygiene, to correspond and prepare personal legal documents; also three cigarettes or their equivalent per day if requested. Any privilege may be curtailed at the express decision of the Hearing Committee after a Hearing."

32. The distinction between administrative and disciplinary custody recognized by the amended version of Administrative Directive No. 801 corresponds to a similar distinction between "Administrative Segregation" and "Punitive Segregation" in July 1972 rules and regulations published by SCI Graterford [Ex. P–2]. Paragraph I of the rules describes "Administrative Segregation" as follows:

"This is reserved for individuals who cannot immediately be placed in the general

population—or will not conform to the normal routine of the institution and require more than the usual amount of custody and supervision over an indefinite period of time."

Assignments to administrative segregation are to be made by "the Behavior Clinic, Treatment Staff, Superintendent, Deputy Superintendent, Major of the Guard, or, in his absence, the Officer-in-Charge"; provision is also made for the prisoner to request administrative segregation. (¶ I.B.2) Residents in administrative segregation are to be housed "[w]here possible, separate from [those in] punitive segregation." (¶ I.B.1.) The rules do not define "Punitive Segregation." They provide for assignment to that category as follows:

"Assignment to punitive segregation will be recommended by the Behavior Clinic and will have the approval of the Superintendent. Pending action of the Behavior Clinic, assignment will be made only by the Superintendent, Deputy, Major or Officer in Charge of the Institution." (¶ I.C.2.)

Residents in punitive segregation are to be housed "[i]n a separate section of [the Maximum Security Cell Block], specifically designed for the housing of disciplinary cases." (¶ I.C.1.) They are subject to much greater restrictions than residents in administrative segregation. The rules provide for review of the cases of residents in both administrative and punitive segregation by the "Behavior Clinic" at least every thirty days.

33. Paragraph V of the amended version of Administrative Directive No. 801 [§ 95.-106] provides that housing in Administrative and Disciplinary Custody shall be divided into "close" and "maximum" classes. In each case, "maximum" custody is described as "housing in the most secure facilities available in the institution"; it "includes the most intensive scrutiny of all matters pertaining to security and the most restrictive regulation of inmate mobility." The paragraph states that "close" custody "involves housing in more secure facilities than those used for general population and re-

stricted mobility", although "[t]he degree of security and restriction of mobility is less than the degree present in maximum custody." Whether confinement is to be at the close or maximum level is to be determined by the Program Review Committee (and initially, in the case of Disciplinary Custody, by the Hearing Committee) on the basis of "the intensity of supervision and control required" and, in disciplinary cases, "the nature and particulars of the offense committed." (Amended Directive, ¶¶ V.A., B.; VI.A.1., B. [§§ 95.106(a), (b); 95.107(a)(1), (b)])

34. The parties have not submitted evidence as to how the restricted housing designations used in the amended version of Administrative Directive No. 801 correspond to the housing quarters at SCI Graterford. From the description of the various designated housing levels, it appears that Close Administrative and Disciplinary Custody corresponds to what has been known as "B Gallery" housing and Maximum Administrative and Disciplinary Custody corresponds to what has been known as the BAU.* No evidence has been presented as to whether SCI Graterford now distinguishes between the privileges afforded to B Gallery and BAU residents according to whether their confinement is for administrative or disciplinary reasons.

* Although the amended Directive no longer uses the term BAU, that name continues to be used by SCI Graterford to refer to the building in which Hoss is housed, and I will use it in that manner throughout this opinion.

35. Standard procedure at SCI Graterford is to place a prisoner transferred from another institution into the same housing category as that in which he was at his previous residence until his status can be reviewed. The initial review is conducted by the Behavior Clinic, a three-man committee consisting of defendant Mauger (the Acting Chairman) and one treatment and one vocational staff member. The Behavior Clinic reviews the transferee's records to determine whether he should be kept in the same housing category as that at his previous residence or placed in a different category. If the Behavior Clinic decides that

the transferee should be housed in the BAU for more than thirty days, it relinquishes jurisdiction over the new inmate to the Program Review Committee.

36. The Program Review Committee is a three-man body which, under Administrative Directive No. 801, consists of the Deputy Superintendent for Operations, the Deputy Superintendent for Treatment Services, and the Director of Treatment (called "Classification and Treatment Supervisor" in the amended Directive). (Original Directive, ¶ III.I.1; amended Directive, ¶ III. G.1. [§ 95.103(g)(1)]) At SCI Graterford, these positions are filled by Deputy Superintendent Meisberger and defendants Sims and Reid. From October 1975 to May 1976, defendant Mauger, as acting Deputy Superintendent for Operations, was on the committee in place of Meisberger, who was on sick leave; he also has substituted for Meisberger since the summer of 1977. The committee's duties include review of misconduct determinations of the Hearing Committee and, since May 1975, review of the status of inmates retained in the BAU for periods longer than thirty days. Prior to May 1975, the BAU inmate status reviews at SCI Graterford were conducted by the Behavior Clinic; the duty was transferred to the Program Review Committee by Superintendent Cuyler in compliance with Administrative Directive No. 801.

37. The following provisions of ¶ III.I. of the original version of Administrative Directive No. 801 were applicable to the Program Review Committee:

" . . . .

2. The resident shall be entitled to have any decision of the Hearing Committee reviewed by the Program Review Committee at his request.

3. The Program Review Committee shall review weekly those cases of residents detained in Administrative Custody or the Behavior Adjustment Units as the result of action of the Hearing Committee.

. . . .

4. The Program Review Committee shall review bi-weekly those cases of residents held in Administrative Custody by self-imposed confinement, administrative protective confinement, transfers, etc.

. . . .

5. The Program Review Committee shall interview in person at least once every 30 days those residents detained in Administrative Custody or the Behavior Adjustment Unit. Residents detained in this status for more than 30 days shall have their cases reported to the Commissioner of Correction, together with the rationale for such status and the particular programs prescribed."

In the amended Directive, these provisions are in ¶ III.G. [§ 95.103(g)], and clauses 3.–5. have been amended to read as follows:

"3. The Program Review Committee shall review weekly those cases of inmates detained in Administrative Custody or Disciplinary Custody and shall decide whether continued custody in those units is appropriate and necessary in each case. This decision will be based upon a review of the counselor's notes and recommendations, additional entries made on the inmate's record regarding his attitude and actions since placement in the restricted housing or since the last weekly review as well as the misconduct which was the basis of the placement for those cases in Disciplinary Custody.

4. The Program Review Committee, as a Committee, shall interview in person at least once every thirty days, those inmates detained in Administrative Custody or Disciplinary Custody. The determination of whether continued confinement is warranted will be based upon a review of the counselor's notes and recommendations, psychological and psychiatric reports when available, recommendations by other staff and their written observations regarding his attitude and actions and his attitude and actions during the interview. If

the inmate is in Disciplinary Custody, the gravity of the misconduct must also be considered. When the Program Review Committee determines that continued confinement is warranted, the inmate shall be given a written statement of the decision and its rationale. In cases of inmates detained in this status for more than thirty days, it shall be reported to the Commissioner of Correction by the Superintendent with his comments as well as those of the Program Review Committee and the rationale for such status and particular programs prescribed shall be stated. All inmates continuously confined in Administrative and Disciplinary Custody for a period of one year shall be given thorough annual psychological and psychiatric examination during this confinement.

5. The Program Review Committee, in releasing an inmate from Disciplinary Custody, must determine whether the inmate is a threat to other inmates, to staff or to himself or poses a threat of escape and all available records on the inmate shall be reviewed and considered to make this decision. In cases where such a determination is made the Program Review Committee may assign the inmate to either Close or Maximum Administrative Custody in cases where the inmate was released from Maximum Disciplinary Custody or to Close Administrative Custody where the inmate was released from Close Disciplinary Custody. This determination will be made in writing and a copy will be provided to the inmate.

Paragraph VI.D. of the original Directive provided:

"Residents in [Administrative Custody, the BAU, and Psychiatric Quarters] shall receive interviews at least weekly by the institution's professional treatment staff in an attempt to restore satisfactory behavior. The Program Review Committee shall release a resident from Administrative Custody or the Behavior Adjustment Unit as soon as feasible."

As amended, that provision (amended Directive, ¶ VI.C. [§ 95.107(c)]) states:

"Inmates in [Administrative or Disciplinary Custody] shall receive interviews at least weekly by the institution's professional treatment staff. The Program Review Committee shall release an inmate from Administrative Custody or Disciplinary Custody as soon as appropriate."

38. Program Review Committee meetings to evaluate the status of BAU confinees are conducted at approximately thirty day intervals, depending on the personnel schedules. The first such meeting with respect to a particular inmate is usually conducted close to the sixtieth day of the inmate's confinement since the committee does not obtain jurisdiction over that inmate's case unless his confinement exceeds thirty days. Each inmate subject to committee review is escorted to the committee meeting from the BAU and interviewed by the Committee members. He is given an opportunity to discuss any changes in his situation and any incidents which occurred since the last review. The committee also reviews his records to obtain updated information. The committee then makes a decision as to the inmate's future confinement status and informs the inmate of that decision.

39. The number of prisoners confined to the BAU for a period greater than sixty days is constantly changing. At the time of trial, nearly half of the BAU residents were in this category. It is not unprecedented for prisoners confined to the BAU for over one year to then be placed in a less restrictive housing area by the Program Review Committee. One such prisoner was Robert Buszka. Buszka's case was in federal litigation at the time he was released from the BAU.

40. Administrative Directive No. 801 requires that all decisions of the Program Review Committee be reviewed by the Superintendent. (Original Directive, ¶ III.K.; amended Directive, ¶ III.H.7. [§ 95.-103(h)(7)]) Paragraph VI.F. of the amended Directive [§ 95.107(f)] provides:

"Every thirty days the Superintendent shall personally review the case of each inmate separated from the general population for thirty days or more. He shall maintain a written report of his findings in each such case and together with a copy of the Program Review Committee's report shall submit them to the Commissioner monthly."

The original Directive, ¶ VI.G., required reviews "not less than once every sixty (60) days."

E. *History of Hoss' Incarceration at SCI Graterford*

41. Hoss was transferred to SCI Graterford from SCI Huntingdon on June 19, 1974. Because he had been in the BAU at SCI Huntingdon, Hoss was immediately placed in the BAU at SCI Graterford.

42. Hoss has been confined to the BAU at SCI Graterford continuously since his transfer to that institution. His cell at the BAU lacks its own lighting; the only light is located outside and out of reach of his cell and is not under his control. He has had the use of a television set in his cell since May 1976. He gets one hour of exercise outside of his cell each day. As a result of his confinement, he is not allowed access to weights for pursuit of his body-building program and cannot engage in the sports activities which he enjoys. He also does not have full access to the prison library or to prison movies. Because his parents live far from SCI Graterford, Hoss was granted permission to have extended two or three hour visits with them once a month in lieu of the normal BAU policy of three one-hour visits per month.

43. On June 24, 1974, Hoss was brought before the Behavior Clinic for the initial SCI Graterford determination of his confinement status. At that meeting defendant Mauger told Hoss that he would be a "permanent party" in the BAU. The decision to keep Hoss in the BAU was based on the fact that Hoss had been confined to the BAU at SCI Huntingdon and had just been convicted of killing a prison guard. BAU confinement was considered necessary to observe Hoss' behavior. A report by Super-intendent Johnson dated June 24, 1974 [Ex. P–27] notes the following disposition of Hoss' case:

"As a result of an interview conducted this date,—To be interviewed at check time only,—subject resident shall be remanded to the BAU, until July 24, 1974, when he will be interviewed."

44. Hoss did not receive another review of his case until August 28, 1974. By this time Hoss had been confined to the BAU at SCI Graterford for two and one-half months, and he began to take actions to obtain release from his confinement. On September 3, 1974, he filed this lawsuit. He also wrote letters to Superintendent Marks requesting a chance to prove that he was capable of being released from the BAU and requesting better treatment during his confinement.

45. SCI Graterford records disclose no significant behavior problems of Hoss during the early period of his confinement at that institution (June 1974—February 1975). Following the August 28, 1974 review, the Behavior Clinic reviewed his case on September 27, 1974; October 29, 1974; December 2, 1974; January 3, 1975; and February 25, 1975. After each of these reviews, a virtually identical report was filed. The September 27, 1974 report [Ex. P–24] is typical; it states in its entirety—

"As a result of an interview conducted this date,—subject resident shall be remanded to the BAU, until October 28, 1974, when he will be interviewed."

Meanwhile, some improvement in Hoss' confinement situation occurred. According to a September 27, 1974 entry on Hoss' Cumulative Adjustment Record [Ex. P–14], a multipage prison document collecting various records relating to Hoss during his incarceration, Hoss requested to work while in the BAU, and, apparently in response to this request, defendant Mauger gave Hoss a work assignment which involved painting cells and janitorial duties. (This assignment later was suspended because the BAU population became crowded.) In addition, as a result of his complaints, Hoss received

more extensive visiting privileges and improvement in his mail service.

46. On March 9, 1975, Hoss was found to have committed a prison misconduct by possessing a contraband weapon. A neighboring BAU resident had awakened Hoss at 3:15 one morning by screaming for a match from the guard. Hoss complained to the neighbor about the screaming, and, in response, the neighbor threatened to kill him. Following that threat, Hoss obtained a sharpened spoon from another prisoner. Hoss threw the spoon away when prison personnel learned that he was carrying it. The misconduct charge resulted from that incident. As punishment, Hoss was restricted to his cell for seven days, thus being denied access to the exercise yard and showers. In addition, as a result of the misconduct, Mauger terminated Hoss' work assignment, which had already been suspended due to crowded conditions in the BAU but which Mauger had intended to reactivate once the crowding had eased.

47. Hoss' next Behavior Clinic review was conducted on March 25, 1975. The copy of the Behavior Clinic report reprinted in Hoss' Cumulative Adjustment Record contains no mention of the misconduct and simply repeats the standard language used in all of the prior reports:

"As a result of an interview conducted this date,—subject inmate shall be remanded to the BAU, until April 25, 1975, when he will be interviewed."

48. On April 6, 1975, Hoss was briefly interviewed in the BAU by Dr. Harvey P. Tapolow, SCI Graterford's staff psychiatrist. In a report dated April 7 [Ex. P–29], Tapolow concluded that a more extensive interview was warranted and recommended that a team evaluation be done with "appropriate security measures" in view of Hoss' "reputation for repeated violence." Tapolow also observed that

"continuous housing in the same cell for over a year is probably not appropriate treatment for anyone, and . . . if a man must be kept in maximum security for prolonged periods of time, . . . he should be rotated from one institution to another."

49. On April 9, 1975, Hoss was given a psychiatric evaluation by a team consisting of Dr. Tapolow, another psychiatrist, and a psychologist. Five correctional officers attended the evaluation. The resulting report [Ex. P–30], authored by Dr. Tapolow, makes repeated references to Hoss' reputation for violence:

"At the present time Mr. Hoss is serving a natural life sentence for rape and murder. He has a rather strong reputation throughout the correctional system as being an extremely violent, easily setoff individual and it is for this reason that he is continuously under maximum security.

. . . It appeared that Mr. Hoss was trying to make a good impression on the Psychiatric Team. He did not appear to be menacing but had a rather passive—almost pitiable expression on his face. There was no evidence of any repressed violence, hostility or surliness about him during the entire interview. He answered all questions honestly and straightforwardly [sic].

. . . He stated that he did not feel that he was a violent person, but that if somebody made a threat to his health he would attack ruthlessly. He further stated that when he did kill somebody for a reason like this he felt absolutely no guilt or remorse.

Mr. Hoss appeared to the Psychiatric Team to be a rather severely passive-aggressive or explosive personality. The possibility of temporal lobe or psychomotor epilepsy could not be ruled out here, though he made no mention of loosing [sic] consciousness when committing violent acts. It was the feeling of the Psychiatric Team that it probably would be good to get testing including psychological testing and exhaustive neurological testing including waking and sleeping, eeg's on this man. The only problem that exist [sic] here is that his behavior pattern by history has been so unpredictable that it would be difficult even to administer the test or psychotherapy if that was found to be necessary without the risk of

having him act-out violently on even the people administering the test for therapy."

The report concluded that even if additional tests couldn't be taken, Hoss should be transferred to another institution:

"Mr. Hoss should probably not be kept in the same cell for this long a period of time but possibly ought to be rotated to various other institutions to decrease the possibility of relative sensory deprivation that occurs when a person is incarcerated in the same small surroundings for prolonged periods of time."

50. On the morning of April 11, 1975, Hoss threw parts of his bedding out of his cell in a dramatic effort to draw attention to his problems. A report on the incident [Ex. D–8] states, "He made no threats; he did say that he wanted help and would act up until he received help." Hoss was charged with a misconduct for committing these acts. Apparently as a result of the incident, Hoss was given a psychological examination on that same day. An April 14 report [Ex. P–32] based on that examination concluded:

"It is felt that [Hoss'] violent behavior will continue and is likely to become more severe until some change is made in the inmates [sic] present living conditions. . . . The unpredictable nature of his behavior necessitates close supervision. His controls deteriorate rapidly when he feels threatened, and he behaves out of proportion to the reality of the situation.

The violent and unpredictable nature of his behavior suggests the possibility of explosive personality associated with temporal lobe or psychomotor epilepsy.

It is felt that a change in his environment such as a transfer to another institution would likely alleviate the distress associated with prolonged environmental deprivation. A neurological examination and psychological testing under appropriate conditions are recommended."

51. On April 30, 1975, another psychiatric evaluation [Ex. P–31] was filed by Dr. Tapolow. The doctor repeated his "strong feeling" that Hoss was in an "extremely stressful environment" and recommended that Hoss "be transferred to a maximum security psychiatric institution such as Farview State Hospital where security could be maintained and, yet, not be as restricted as it is to him at the present time."

52. In May 1975, responsibility for reviewing BAU residents' confinement status was transferred from the Behavior Clinic to the Program Review Committee. A May 9, 1975 report of that committee reprinted in Hoss' Cumulative Adjustment Record reads as follows:

"Security risk: charged with the murder of officer at SCI [Pittsburgh], Dec. 1973. Recent misconduct for having a knife in the exercise yard in BAU; recommend to be transferred to another institution to change environment (submitted to Deputy Commissioner—no action). Psychiatric report recommends transfer to Farview—no action."

Subsequent committee reports were filed at roughly one-month intervals: June 9, 1975; July 1, 1975 *; August 1, 1975; and September 1, 1975. Generally, each of these reports reads the same as that issued on May 9, 1975, except that they do not mention any recent misconducts. The June 9, 1975 report, as reprinted in Hoss' Cumulative Adjustment Record is typical:

"Stanley Hoss, P–0310 serving a life sentence for 1st. Degree Murder. In our BAU since 6/19/74 as a security risk. He is charged with the murder of an officer at SCI [Pittsburgh]. All BAU reports for the last 30 days are satisfactory. Recent psychological team reports recommend transfer to another institution for change in scenery 4/9/75, psychiatrist recommend [sic] transfer to Farview 4/30/75; no action on any of the recommendations. Physical appearance depressed but normal."

A June 10, 1975 entry in Hoss' Cumulative Adjustment Record notes, "Case reviewed by Supt. Cuyler." It is the only such notation in Hoss' record.

* A July 1, 1975 report has not been made part of the record, and there is no separate entry for such a report in Hoss' Cumulative Adjustment

Record. Nevertheless, the August 1, 1975 report, as reprinted in the Cumulative Adjustment Record, states, "There has been no change in status since last report of 7–1–75." Since all of the other reports were made at monthly intervals, I believe that there must have been a July 1 report.

53. The next Program Review Committee report on Hoss was issued on October 1, 1975. As reprinted in Hoss' Cumulative Adjustment Record, it essentially follows the pattern of the earlier reports, except that it notes that Hoss was not present for his review because he was in the recreation area. At the committee's direction, Hoss' counselor interviewed him at a later date to obtain any information that Hoss wanted conveyed to the committee. The October 1 report also notes that Hoss was "not seen as appropriate for transfer to a mental hospital, as there is no psychiatric basis for admittance." The committee maintained its recommendation that Hoss be transferred to another institution.

54. Hoss was next reviewed by the Program Review Committee on November 6, 1975, and a report on that review was issued on November 10. The report was essentially the same as those issued previously by the committee. Subsequent committee reports issued on November 25, 1975 (based on review conducted November 19) [Ex. P–16]; December 31, 1975 (based on review conducted December 30) [Ex. P–17]; and February 3, 1976 (based on review conducted January 27) [Ex. P–18] were somewhat more detailed, however. These latter reports note that gradual involvement of Hoss in various types of "programming," including a ceramic work program, and the December 31 report comments that this "is seen as a positive step." The work program (in which Hoss is still active) has involved the painting of ceramic figurines; all work has been done by Hoss inside his cell without special instructions. The February 3 report noted the further possibility of Hoss' involvement in a language course using cassette tapes. The November 25 and December 31 reports continue the recommendation that Hoss be transferred, but add that no formal transfer petition had been submitted "because the situation is such that some prior awareness and approval of transfer plan would have to be made." Following each of these reviews by the committee, Hoss was given a standard form copy of the committee's decision, which was filled out in longhand. The decision issued after the November 6 review [Ex. P–7] is typical. The standard form reads, in typed lettering, "The Program Review Committee has completed its 30-day Review of your situation. The decision reached is as follows:"; there follows the following handwritten entry:

"Continue in BAU as a security case. Recommend consideration by central office for transfer to another institution."

Beginning with the decision on the January 27 review, the last sentence of this entry is omitted.

55. On the morning of February 17, 1976, while on his way to the shower, Hoss became involved in an incident which led to a misconduct charge. Another BAU resident, Daniel Bosna, made a profane, derogatory statement to Hoss. (Hoss disparagingly characterized Bosna as a "30-day wonder," *i. e.,* a man confined to the BAU for only thirty days who, according to Hoss, undergoes a change in personality, becoming more violent and raucous.) Enraged at Bosna's statement, Hoss ripped an electrical conduit (a lengthy piece of pipe) from the ceiling and attacked Bosna in his cell, inflicting superficial lacerations. A short time later, at the urging of the guards, who did not physically intervene, Hoss dropped a piece of the pipe in the corridor, returned to his cell, and closed the door, stating that he would attack prison guards in the future. About one hour later, Hoss surrendered a three-foot piece of the conduit that he had retained in his possession. Hoss was found to have committed a prison misconduct as a result of this incident and, as punishment, was restricted to his cell for three days (*i. e.,* he was not allowed to leave his cell for showers or recreation.)

56. The Program Review Committee reviewed Hoss' case on February 25, 1976. In its report [Ex. P–19], it noted that "Hoss was less open than on previous reviews," apparently as a result of the February 17 incident. The committee also noted that

Hoss was no longer involved or interested in any "programming," including the ceramic work program. In its next report on April 5, 1976 (based on review conducted March 29, 1976) [Ex. P–20], however, the committee noted that Hoss was "more relaxed and cooperative" and was interested again in the ceramic work program and the possibility of a language course.

57. On March 1, 1976, Hoss began an instructional program in Spanish. A tape recorder and cassettes were made available to Hoss and a teacher, Beverly Thompson, visited Hoss daily, except for those times when Thompson was on vacation or other leave. Thompson has a Bachelor of Science degree and a teaching certificate from the Commonwealth of Pennsylvania, and he is certified to teach elementary and secondary school. Thompson is not a certified Spanish language teacher; there are no foreign language teachers at Graterford, and inmates in general population do not have the option of studying foreign language on a basis different from that available to Hoss. Thompson spent approximately three hours a day teaching eight inmates in the BAU, including Hoss.

58. On Thursday, April 22, 1976, defendant Mauger ordered Hoss restricted to his cell based on rumors that he had a razor in his cell and that if he were let out of his cell he would cause trouble in protest against the prison's rejection of certain books as objectionable. The rumors were later found to be without foundation, and the restrictions were lifted on Monday, April 26.

59. The Program Review Committee reviewed Hoss' case on April 29, 1976. In its report, dated May 3, 1976 [Ex. P–21], the committee noted that Hoss was working with ceramics once again and was learning Spanish through the use of cassette tapes. In addition, extra security measures that had been imposed on his visitation privileges had been lifted. The committee repeated the recommendation included in all of its reports that Hoss be continued in BAU confinement "as a security case."

60. Trial in this case was conducted at SCI Graterford on June 1, 1976. During testimony at the trial, defendants Cuyler, Mauger, Reid, and, by deposition taken May 24, 1976, Sims, stated that they did not believe that Hoss had made a sufficient behavioral adjustment to allow his release from the BAU. They stated that they could not delineate any specific objective criteria which would be used to determine when Hoss had made a sufficient adjustment, and defendant Reid expressed the view that, if Hoss were given objective standards to conform to, Hoss would pattern his behavior to meet those standards without actually making the overall underlying behavioral adjustment necessary to live in a less restrictive environment. They testified that they did not intend to keep Hoss confined to the BAU forever and that they did intend to release him from BAU confinement once they believed that he was capable of peacefully living in a less restrictive environment. Also during testimony at trial, Dr. Tapolow repeated his view that continued BAU confinement for Hoss "can be stressful in itself and counterproductive to psychiatric health" (N.T. 88), although he acknowledged that it might be necessary for security.

61. Hoss was interviewed by the Program Review Committee on June 3, 1976. The committee's report on that interview, dated June 7 [Stip., Ex. A], reads as follows:

"Hoss approached the Committee interview in a subdued manner, discussing his work with Spanish language cassettes under Mr. Thompson's supervision, as well as his continuing in the ceramic cellwork program. Hoss then began referring to his recent civil action trial, asking if individuals on the Committee were thoroughly familiar with his records and his background. It seemed apparent that anger was building inside him rapidly. He asked the Chairman if it was right or fair for personal feelings to be part of the basis for statements. Attempts by the Committee to steer the discussion off the topic of the trial were unsuccessful. Hoss, handcuffed, stood up in front of the

desk Mr. Reid was sitting at and spat on him, threatening to kill him and using racial slurs. Several officers rushed into the room, but Hoss threatened them if they touched him. He then left the room, accompanied by the officers. A misconduct report was submitted by Mr. Reid.

Committee views this incident as another example of Hoss' explosive and violent behavior. He continues to demonstrate a need for the level of security represented by BAU. In view of this incident involving the Program Review Committee, a transfer of Hoss to another institution is strongly recommended."

As a result of the incident set forth in the report, it was decided that defendant Reid no longer should participate in committee reviews of Hoss; Reid was replaced by Director of Treatment Adrian Callender.

62. Hoss' next committee review was scheduled for June 30, 1976, but the committee decided not to allow Hoss to leave his cell to be interviewed on that day. According to a July 1, 1976 committee memorandum [Stip., Ex. B], on June 29 an inmate, Guy Thomas, had spit on Reid during a committee review, stating, "This is for Stanley Hoss", and on June 30 another inmate, Joseph Bowen, had made a "very unusual" inquiry about Hoss during his own committee interview. These incidents, reports that Hoss "was in an unusually tense mood", and the unavailability of Callender (Reid's replacement) caused the committee to postpone Hoss' review.

63. The committee's next reviews were conducted on July 7, 1976 (report dated July 12) [Stip., Ex. C]; August 11, 1976 (report dated August 12) [Stip., Ex. D]; and September 22, 1976 (report dated September 29) [Stip., Ex. E]. According to the committee reports, Hoss was more subdued than he had been during the June 7 interview and was concerned primarily with administrative delay in deciding whether to transfer him to another institution. During his August 11 interview, he repeated his request for transfer to B Gallery, and the request was refused. Meanwhile, in early July, he stopped participating in the ceramic work program. The committee's September 29 report states that Hoss requested "some counseling or therapy" from a Dr. Van Wye and notes, "Committee agrees that it can be provided, although security arrangements will have to be made." The report also notes a request by Hoss for a personal interview with the superintendent; Hoss later received the requested interview.

64. On October 19, 1976, Hoss resumed participation in the ceramic work program. On October 29, he refused to be interviewed by the Program Review Committee [Stip., Ex. F], but subsequent reviews were conducted on December 2, 1976 [Stip., Ex. G] and February 2, 1977 [Stip., Ex. H]. At the February 2 interview, he complained about delay of the prison transfer decision and the temporary suspension of his Spanish classes; the report also notes, "He complained that promises were made concerning weightlifting equipment for BAU inmates which was [sic] later denied, leading to some type of disruptive action on his part a few weeks ago." The report concluded:

"It is increasingly apparent to the [committee] that Stanley Hoss is not improving his behavior control in the BAU, yet he represents too much of a risk for lesser security at this institution, especially in view of threats he has made against our staff, such as Mr. Reid. [The committee] recommends continuance in the BAU."

65. On February 18, 1977, Hoss began working as a janitor in the BAU, and he has continued that work to this date. He works five days per week, from 6:00 a. m. to 2:00 p. m., and receives 22 cents per hour compensation for performing his duties. While on the job, Hoss is outside his cell for approximately five to six hours daily. All work is done exclusively in one BAU cell block consisting of nine cells.

66. In March 1977, Hoss notified the Program Review Committee that he did not want to be transferred to another prison. He declined to be interviewed on March 31, 1977 [Stip., Ex. I] and was not interviewed again until June 1, 1977 [Stip., Ex. J], when he requested permission to send his televi-

sion set home and repeated his desire to be placed in B Gallery. As to the latter request, Hoss "was advised that he must continue to demonstrate a stable adjustment to warrant such consideration." Hoss refused to be interviewed on July 7, 1977 [Stip., Ex. K] but was interviewed on July 20. A report on the latter review, dated July 21 [Stip., Ex. L], noted that Hoss "was upset and agitated" because he felt that he was being singled out in an investigation of the BAU.

67. On August 5, 1977, pursuant to a suggestion by the Court that counsel arrange for Hoss to be examined by a psychiatrist not associated with the Pennsylvania prison system, Hoss was examined by Dr. Robert L. Sadoff, an internationally recognized forensic psychiatrist. During the interview Hoss remained handcuffed and guards were stationed outside of the interview room. In a report dated August 8, 1977, Sadoff expressed the following opinion:

"It is my conclusion . . . that Mr. Hoss is not deteriorating psychologically in the BAU. He is working very hard to keep from such deterioration and has been succeeding in his efforts. He is keeping busy, maintaining a routine, writing letters, working at a janitorial job and apparently has been cooperating with the people who are taking care of him. Keeping him in the BAU for security reasons, or removing him at this time does not appear to be dependent upon a psychiatric condition, but rather a correctional matter. He does not seem to be deteriorating psychologically to the point that he needs a transfer or a shift at this point, and he is not so emotionally disturbed psychiatrically that he requires isolation and confinement. That is, he does not appear to be acutely violent or suicidal. Decisions about his retention in the BAU or discharge from it should be based on a total correctional approach and the psychiatric input should be only one aspect or factor. At this point the psychiatric issue does not appear to be a significant one in the decision to either retain or discharge Mr. Hoss from the BAU."

68. On August 9, 1977, pursuant to the Court's suggestion that an outside psychiatric examination be conducted and an August 3, 1977 order of this Court directing the defendants at SCI Graterford to allow an examination of Hoss by a doctor retained by Hoss' counsel, Hoss was examined by Dr. Frank Rundle, a psychiatrist with extensive experience in dealing with the psychiatric problems of prisoners. In an undated report filed with the Court on October 25, 1977, Rundle expressed the following opinion:

"6. *Predictions concerning subject Hoss' dangerousness and his adjustment should he be released from the maximum security area of the BAU.*

The prediction of behavior dangerous to the safety and lives of others is a matter of considerable current controversy but most behavioral science experts involved in this particular area agree that it is not possible to predict with any certainty whether or not a given individual will behave in such a manner. However, Mr. Hoss does not display persecutory distortion in reality nor persecutory delusions which in some instances cause a person to respond violently to actions of other persons which are interpreted in the view of the delusion or major distortion of reality.

It is my opinion that if Mr. Hoss is retained in the maximum security area of the BAU or any similar unit in any other institution it is much more predictable that in that circumstance he will become dangerous to the lives of correctional personnel. Long term confinement in such circumstances within prison in my experience has led to the development of intense and diffuse hatred, bitterness, and a determination for revenge against the correctional staff, the institution, and society which has in many instances resulted in the deaths of correctional staff and in my opinion predictably would in this case. On the other hand, I believe that there are indications that Hoss has become resigned to certain realistic ele-

ments of his circumstances, primarily that he will never leave prison and therefore should make the best of it, which has resulted in his conforming his behavior to the requirements of the institution and to his engaging in a self education project which in the opinion of the staff person dealing with him has been most constructive.

7. *Recommendations.*

It is my recommendation that Mr. Hoss be placed in an area such as "B" Gallery at Graterford which in terms of security presents an intermediate step between the stringent security regulations of the BAU and the less stringent regulations of general population. While in that area he should be assigned a regular job and should be given the opportunity to engage in educational and other programs. In addition, he should be given the opportunity to engage in a regular therapeutic treatment or counseling relationship, either individual or group, on an ongoing basis. If in that situation, with such treatment arrangements, he continues to behave in a manner which is clearly not dangerous to inmates or staff, he should then be placed in the general population and his engagement in programs expanded."

69. Hoss' confinement status was reviewed by the Program Review Committee on August 17, 1977 (report dated August 22) [Stip., Ex. M] and September 14, 1977 (report dated September 15) [Stip., Ex. N]. In the August interview he expressed concern that he was the target of efforts to tighten up BAU security; the committee responded that this was not the case. The August report comments that "Hoss seemed to be in somewhat better control than on last interview and discussed his situation in B.A.U. at considerable length." The September report notes a recent misconduct but gives no details.

70. In late September 1977, Beverly Thompson, the Spanish teacher, resigned, and Hoss' Spanish lessons were discontinued, although a tape recorder and cassettes continued to be available to him.

71. The committee reviewed Hoss' confinement status on October 13, 1977 [Stip., Ex. O], at which time it rejected Hoss' renewed request to be placed in general population. The report of Hoss' November 21, 1977 review [Stip., Ex. P] notes a November 10 misconduct:

"Stanley Hoss received a misconduct on 11/10/77 for climbing the recreation yard fence and going onto the roof of the BAU, accompanied by Franklin Castle, K–2609. They eventually came down without further incident, after the Superintendent heard their complaints. Apparently Hoss did this to draw attention to his complaints about the handling of his mail."

72. At the end of November 1977, Julio Ruiz, a teacher certified by the Commonwealth of Pennsylvania to teach English to Spanish-speaking individuals, began teaching Hoss Spanish. Since then, Ruiz has met with Hoss once per week.

73. Hoss' status was reviewed by the Program Review Committee on January 5, 1978 (report dated January 9) [Stip., Ex. Q]. The report of that review concludes:

"Hoss again requests to move on to B–Gallery or into population, but [committee] indicated to him that his conduct in the BAU does not warrant such consideration. [Committee] recommends continuance in the BAU as a security case at this time. Review in 30 days."

Hoss continues to be involved in his janitorial work, the ceramics program, and the Spanish lessons.

F. *Assessment of Defendants' Conduct with Regard to Hoss*

74. At all times pertinent to this action, each of the defendants was acting in his official capacity by authority of the Commonwealth of Pennsylvania.

75. At no time did any of the defendants act in conspiracy with each other to deprive Hoss of any of his rights or privileges.

76. None of the defendants' actions with respect to Hoss were taken because of a class-based discriminatory motivation.

77. None of the defendants have acted with the purpose of depriving Hoss of constitutional rights.

78. At all times pertinent to this action, each of the defendants acted in good faith with a reasonable belief in the propriety of their actions.

79. Throughout the period of Hoss' confinement at SCI Graterford, defendants Cuyler, Mauger, Sims, and Reid have intended to keep Hoss confined to the BAU until they believed that he had made a sufficient behavioral adjustment to enable him to be placed in a less restrictive housing category without provoking or becoming the victim of violent incidents. They have assumed that it would take Hoss a very long period of time to make such an adjustment. As a result, many of Hoss' status reviews (especially those during the earliest period of Hoss' confinement) have been essentially *pro forma,* although Hoss was afforded an opportunity to call to the authorities' attention any problems which he had while in BAU confinement.

80. The defendants have not assessed Hoss' BAU confinement status in accordance with any agreed-upon objective criteria.

81. The defendants have not sought to have periodic psychiatric reports of Hoss made for consideration in assessing Hoss' BAU confinement status, although they have read and considered psychiatric reports whenever they were available.

82. The authorities responsible for Hoss' BAU confinement continue to consider Hoss a "security case," an assessment which, in this context means that they believe Hoss' behavior to be such that releasing him into a less restrictive housing category will present a danger of violent incidents. Under an objective assessment of Hoss' situation, that belief is reasonable.

## DISCUSSION

Stanley Hoss filed this action *pro se* on September 3, 1974. The original complaint named only two defendants, Superintendent Johnson and Major Mauger. Following appointment of law student counsel, the complaint was amended to substitute Superintendent Cuyler for Johnson and to add as defendants Deputy Superintendent Sims, Director Reid, and Commissioner Robinson.[1]

■ The action is based on two sections of the Civil Rights Act of 1871, 42 U.S.C. §§ 1983, 1985.[2] Hoss has not forcefully advocated the § 1985 claim,[3] but, since that claim has not been formally withdrawn, I shall discuss it briefly before reaching his major contentions under § 1983.

### I. *The § 1985 Claim*

■ Section 1985 crates a civil cause of action for a person injured as a result of

1. Apparently because of oversight, the order granting the motion to amend was not entered until February 1, 1978, almost two years after it was filed. The motion was unopposed, and, at all times since its filing, including during trial (*see* N.T. 6–7, 186), the case has been litigated as though the motion had been granted.

 The caption of Hoss' *pro se* complaint was written in the form of a federal habeas corpus petition in that the action was brought in the name of the United States and Hoss was named as relator. Although the caption has been amended with respect to the defendants, it has never been amended to reflect the fact that Hoss is the true plaintiff.

2. In the complaint, Hoss also invoked 42 U.S.C. § 1984, which is the codified version of § 5 of the Act of Mar. 1, 1875, ch. 114, 18 Stat. 337. That obsolete section only authorizes Supreme Court review of actions brought under one of the other four sections of the 1875 statute.

The first two sections of the 1875 Act were declared unconstitutional in *The Civil Rights Cases,* 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883). The other two sections were repealed upon enactment of the Criminal Code of 1948, ch. 645, § 21, 62 Stat. 862. Hoss cannot maintain a cause of action under 42 U.S.C. § 1984.

3. This case has been in litigation more than three and one-half years, and during that time the identity of Hoss' student counsel has changed. As a result, there have been shifts in Hoss' legal position and there is some uncertainty whether legal contentions asserted at an earlier stage of the litigation are still viable or have been abandoned. The § 1985 claim, which appears in the complaint but has not been advocated by counsel, is just one example of this problem. Throughout this opinion, I shall not assume that an issue has been abandoned unless explicitly so stated by the parties.

any of various conspiracies to interfere with civil rights.[4] The actionable conspiracies cover a wide range of activities, including interference with the duties of federal officials (§ 1985(1)), interference with federal court proceedings (§ 1985(2)), obstruction of the "due course of justice in any State or Territory" with the intent to deny equal protection of the laws (§ 1985(2)), direct or indirect infringement of equal protection rights (§ 1985(3)), and interference with federal voting rights (§ 1985(3)). This case does not fit within any of these categories.

The only provision of § 1985 that might arguably be implicated in this case is that part of § 1985(3) which proscribes conspiracies to infringe equal protection rights. By its terms, that provision applies to—

"[T]wo or more persons in any State or Territory [who] conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws. . . . ."

Hoss has not identified any discriminatory motive underlying defendants' conduct. Conceivably, since Hoss is white and some (but not all) of the defendants are black, it might be contended that defendants' actions were racially motivated, but there is simply no support in the record for such a finding. Since this provision of § 1985(3) only deals with the infringement of equal protection rights, some discriminatory motivation must be shown. Hoss has proven no such motivation—racial or otherwise [5]—and

4. The statute provides:
"[I]n any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators."

5. Since the record discloses no class-based discriminatory motivation of any type, I need not decide what type of discrimination is actionable under § 1985(3) where, as here, the defendants acted under color of state law. In *Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971), the Supreme Court held that § 1985(3) could reach purely private conspiracies not involving state action and that such an application of the statute was constitutional under Congress' Thirteenth Amendment power to eliminate badges and incidents of slavery and independent power to protect the right of interstate travel as an attribute of national citizenship. In that context, the Court stated that "there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." 403 U.S. at 102, 91 S.Ct. at 1798 (footnote omitted). It refused to decide "whether a conspiracy motivated by invidiously discriminatory intent other than racial bias would be actionable under . . . § 1985(3)." *Id.* at 102 n. 9, 91 S.Ct. at 1798.

Since that decision, lower courts have struggled to determine what types of non-racial discrimination are actionable. *See, e. g., McLellan v. Mississippi Power & Light Co.*, 545 F.2d 919, 928–29, 931–33 (5th Cir. 1977) (en banc), *vacating* 526 F.2d 870, 873–79 (5th Cir. 1976) (panel opinion); *Cameron v. Brock*, 473 F.2d 608, 610 (6th Cir. 1973); *Santiago v. City of Philadelphia*, 435 F.Supp. 136, 156 (E.D.Pa. 1977); *Local No. 1 (ACA), Broadcast Employees v. Int'l Bhd. of Teamsters,* 419 F.Supp. 263, 276–77 (E.D.Pa.1976); Note, The Scope of Section 1985(3) Since *Griffin v. Breckenridge*, 45 Geo.Wash.L.Rev. 239, 252–56 (1977). It is generally recognized that, as its title stated, 17 Stat. 13, the 1871 Civil Rights Act was enacted to enforce the Fourteenth Amendment as well as to achieve Congress' other objectives. *See, e. g., Phillips v. Trello,* 502 F.2d 1000, 1005 (3d Cir. 1974). As such, when applied to conspiracies involving state action, § 1985 may be "accord[ed] . . . a sweep as broad as its language" (*United States v. Price,* 383 U.S. 787, 801, 86 S.Ct. 1152, 1160, 16 L.Ed.2d 267 (1966), *quoted in Griffin, supra,* at 97) and interpreted to reach all discrimination encompassed within the Fourteenth Amendment's Equal Protection Clause. *See Griffin, supra,* at 96–97 (recognizing similarity between language of the Clause and § 1985(3)); Note, *supra,* 45 Geo.Wash.L. Rev. at 254, 259 (suggesting that type of actionable discrimination should be determined by assessing source of Congressional power to apply § 1985 to facts of each case). I intimate no view on this question.

therefore he may not recover under this portion of the statute.

Hoss has not proven that the defendants engaged in any activities that violate § 1985. All of the defendants therefore are entitled to judgment in their favor on the § 1985 claim.

## II. *The § 1983 Claim*

The primary basis for Hoss' case is 42 U.S.C. § 1983, which provides:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

This section imposes two requirements for recovery: first, that a defendant have acted under color of state law (statutory or otherwise), and, second, that while so acting he caused the plaintiff to be deprived of rights, privileges, or immunities secured by federal law.

There is no doubt that the first of the § 1983 requirements has been established in this case. It is undisputed that each of the defendants acted in this case pursuant to authority vested in him by the Commonwealth of Pennsylvania with respect to the state's correctional institutions. "Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law." *United States v. Classic*, 313 U.S. 299, 326 (1941), 61 S.Ct. 1031, 1043, 85 L.Ed. 1368;

accord, *Monroe v. Pape*, 365 U.S. 167, 171–87, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); *Jennings v. Shuman*, 567 F.2d 1213, 1219–20 (3d Cir. 1977).

The major issue in this case is whether the defendants deprived Hoss "of any rights, privileges, or immunities secured by the Constitution and laws." Hoss asserts that he has been denied rights secured by § 1 of the Fourteenth Amendment to the Constitution, which provides:

> "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

More specifically, Hoss contends that, in violation of § 1's Due Process Clause, he has been subjected to cruel and unusual punishment and denied procedural due process guarantees.

### A. *Cruel and Unusual Punishment*

■ Since adoption of the English Bill of Rights, 1 W. & M. c. 2, in 1689, Anglo-American law has recognized a substantive limitation on the government's power to impose excessively cruel criminal punishments.[6] With ratification of the American Bill of Rights in 1791, such a limitation on federal power was written into the Eighth Amendment to the Constitution:

> "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

As the wording of this amendment implies, its prohibition of punishments judged to be cruel and unusual is absolute.[7] *See, e. g.,*

---

6. *See generally Ingraham v. Wright*, 430 U.S. 651, 664–66, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977); *Furman v. Georgia*, 408 U.S. 238, 316–22, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Marshall, J., concurring); Granucci, "Nor Cruel and Unusual Punishments Inflicted": The Original Meaning, 57 Calif.L.Rev. 839 (1969).

7. Although they may be written in absolute terms, some of the provisions of the Bill of Rights have been held to impose only qualified

restrictions on governmental power in the sense that the government may infringe on liberty interests protected by those provisions if to do so will serve an overriding governmental objective. *See, e. g., Buckley v. Valeo*, 424 U.S. 1, 12–84, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (First Amendment freedoms of speech and association). No such qualification has ever been applied to the prohibition of cruel and unusual punishments, however. Although governmental objectives and attitudes are fac-

*Weems v. United States,* 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910).

■ Of course, like other provisions of the Bill of Rights, the Cruel and Unusual Punishments Clause of the Eighth Amendment only directly prohibits federal conduct, not that of the states. *O'Neil v. Vermont,* 144 U.S. 323, 331–32, 12 S.Ct. 693, 36 L.Ed. 450 (1892); *In re Kemmler,* 136 U.S. 436, 442, 446, 10 S.Ct. 930, 34 L.Ed. 519 (1890); *Pervear v. Commonwealth,* 72 U.S. (5 Wall.) 475, 479–80, 18 L.Ed. 608 (1866). *See generally Barron v. Mayor of Baltimore,* 32 U.S. (7 Pet.) 243, 8 L.Ed. 672 (1833). Nevertheless, the Supreme Court has held that the prohibition against cruel and unusual punishment is "incorporated" into the Fourteenth Amendment's proscription of state deprivations of liberty without due process of law. Although the analytical basis for the "incorporation doctrine" has not been precisely articulated, the result which it establishes in this case is clear: freedom from cruel and unusual punishment is one aspect of the "liberty" recognized by the Due Process Clause,[8] and this freedom is entitled to an identical degree of substantive protection from state infringement as that which applies to federal infringements under the Eighth Amendment.[9] *See, e. g., Coker v. Georgia,* 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977); *Roberts v. Louisiana,* 431 U.S. 633, 97 S.Ct. 1993, 52 L.Ed.2d 637 (1977); *Ingraham v. Wright,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977); *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); *Roberts v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976); *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); *Powell v. Texas,* 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254

tors considered in determining whether punishment is cruel and unusual, once such a determination is made, the punishment is absolutely prohibited.

8. As used in the Due Process Clause, the general term "liberty" has been given an expansive interpretation. *See, e. g., Board of Regents v. Roth,* 408 U.S. 564, 572, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). By "incorporating" such provisions of the Bill of Rights as those of the First Amendment guaranteeing freedom of speech and press (*e. g., Near v. Minnesota ex rel. Olson,* 283 U.S. 697, 707, 51 S.Ct. 625, 75 L.Ed. 1357 (1931); *Stromberg v. California,* 283 U.S. 359, 368, 51 S.Ct. 532, 75 L.Ed. 1117 (1931); *Whitney v. California,* 274 U.S. 357, 47 S.Ct. 641, 71 L.Ed. 1095 (1927); *Gitlow v. New York,* 268 U.S. 652, 666–67, 45 S.Ct. 625, 69 L.Ed. 1138 (1925)), assembly (*DeJonge v. Oregon,* 299 U.S. 353, 364, 57 S.Ct. 255, 81 L.Ed. 278 (1937)), and religion (*Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940)), as well as the Eighth Amendment's cruel and unusual punishment prohibition, the Supreme Court has identified some specific aspects of this broad term. It may be noted that certain other "incorporation" cases seem to have interpreted the general phrase "due process of law" by identifying certain procedural requirements which must attend state deprivations of life, liberty, or property in criminal cases. *See, e. g., Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491

(1968) (incorporating Sixth Amendment right to jury trial); *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965) (incorporating Sixth Amendment right to confront opposing witnesses); *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (incorporating Sixth Amendment right to counsel).

9. Generally, recognition of an interest as encompassed within Fourteenth Amendment "liberty" only results in accordance of certain procedural due process safeguards during deprivation of the interest and in a substantive restriction on abridgments of the interest which are not rationally related to attainment of legitimate governmental objectives. *See McKnight v. Southeastern Pa. Transp. Auth.,* 438 F.Supp. 813, 825 (E.D.Pa.1977) (citing cases), *appeal docketed,* No. 77–2563 (3d Cir., Dec. 13, 1977). When the liberty is "fundamental", however, the Supreme Court has applied a more stringent measure of substantive due process protection in deference to the important role which those liberties have historically held in American life. *See id.* at 825–26 (citing cases). By "incorporating" certain provisions of the Bill of Rights, the Supreme Court has recognized that the freedoms guaranteed thereby are "fundamental" and has accorded them the full degree of substantive protection from state infringement as is afforded against federal infringement by the Bill of Rights. *See Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

(1968); *Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

As the Supreme Court has repeatedly observed, cruel and unusual punishment is a flexible concept which has undergone continuous change and historical development. As the Court stated in *Estelle v. Gamble,* 429 U.S. 97, 102–03, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976):

> "[T]he [Eighth] Amendment proscribes more than physically barbarous punishments. [Citations omitted.] The Amendment embodies 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency . . . ,' *Jackson v. Bishop,* 404 F.2d 571, 579 (CA8 1968), against which we must evaluate penal measures. Thus, we have held repugnant to the Eighth Amendment punishments which are incompatible with 'the evolving standards of decency that mark the progress of a maturing society,' *Trop v. Dulles,* 356 U.S. 86, 101 [, 78 S.Ct. 590, 2 L.Ed.2d 630] (1958) (plurality opinion) [other citations omitted], or which 'involve the unnecessary and wanton infliction of pain,' *Gregg v. Georgia,* 428 U.S. 153, 173 [, 96 S.Ct. 2909, 49 L.Ed.2d 859] (1976) (plurality opinion) [other citations and footnote omitted]."

Although the historical focus of the prohibition has been on the infliction of physical pain, it has been applied to any punishment which is "excessive," not only in inflicting physical discomfort, but also in being "grossly out of proportion to the severity of the crime." *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976) (plurality opinion). Indeed, the prohibition has been held to place substantive limits on what may be criminally punishable. *Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) (striking down state statute making status of being addicted to a narcotic drug a criminal offense); *cf. Powell v. Texas,* 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968) (dealing with crime of public drunkenness). The basic principle is that the penalty "must accord with 'the dignity of man,' which is the 'basic concept underlying the Eighth

Amendment.'" *Gregg, supra,* 428 U.S. at 173, 96 S.Ct. at 2925, quoting *Trop v. Dulles,* 356 U.S. 86, 100, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (plurality opinion). *See also Furman v. Georgia,* 408 U.S. 238, 329–33, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Marshall, J., concurring).

Although the prohibition against cruel and unusual punishment imposes a duty on the federal judiciary to judge the constitutionality of penal measures, it has been recognized that "the requirements of the Eighth Amendment must be applied with an awareness of the limited role to be played by the courts." *Gregg, supra,* 428 U.S. at 174, 96 S.Ct. at 2926. Thus, in assessing whether measures taken by prison officials constitute cruel and unusual punishment, deference is traditionally granted to the decisions of prison officials who are charged by society with responsibility for operating correctional institutions. *See, e. g., Frazier v. Ciccone,* 506 F.2d 1022, 1023–24 (8th Cir. 1974), quoting *Sawyer v. Sigler,* 445 F.2d 818, 819 (8th Cir. 1971); *Breeden v. Jackson,* 457 F.2d 578, 580–81 (4th Cir. 1972). As the Court of Appeals for the Fifth Circuit recently stated:

> "Federal courts are extremely reluctant to limit the freedom of prison officials to classify prisoners as they, in their broad discretion, may deem appropriate, [citations omitted].
>
> State penitentiaries are occupied by convicted felons, either ineligible for or found to be unworthy of probation. By its very nature, the operation of such a prison is a dangerous undertaking. Time and time again, experience has dramatically taught that the management and control of prisons, the prevention of mass violence within prisons, and the safe retention of convicts within prison walls, present problems of the first magnitude, in which failures occur all too often . . .
>
> The authority to manage and control a felony prison should never be unduly restricted or divided. That authority must repose in one well identified place, limited only by the requirements of the law."

*Newman v. Alabama,* 559 F.2d 283, 287 (5th Cir. 1977) (discussing court-imposed remedies for state prison conditions held to be cruel and unusual), *petition for cert. filed,* 46 U.S.L.W. 3650 (U.S., Apr. 6, 1978) (No. 77–1422).

Hoss contends that his incarceration in the BAU at SCI Graterford for an indefinite period of time constitutes cruel and unusual punishment. In assessing this contention, I need not dwell on the fact that continued BAU confinement imposes hardship on Hoss. The record demonstrates that, as a result of segregation in the BAU, Hoss has been deprived of some of the amenities available to inmates in the general prison population and that, in the view of some experts, his continued isolation may be psychologically harmful. The question is whether this situation is so inhumane that it is unconstitutional.

At the outset, I note that Hoss does not contend that segregated confinement is cruel and unusual punishment *per se.* Although certain types of punishment may be so abhorrent to contemporary standards of decency that they never may be utilized (*see, e. g., Trop, supra,* 356 U.S. at 101–103, 78 S.Ct. 590 (plurality opinion) (denationalization); *Wilkerson v. Utah,* 99 U.S. 130, 135–36, 25 L.Ed. 345 (1878) (torture)), it is generally recognized that solitary confinement of a prisoner does not fall within this category. *See, e. g., Crowe v. Leeke,* 540 F.2d 740, 741 (4th Cir. 1976); *Gregory v. Wyse,* 512 F.2d 378, 381 (10th Cir. 1975); *Sostre v. McGinnis,* 442 F.2d 178, 192–93 (2d Cir. 1971), *cert. denied,* 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 & 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972); *Courtney v. Bishop,* 409 F.2d 1185, 1187 (8th Cir.), *cert. denied,* 396 U.S. 915, 90 S.Ct. 235, 24 L.Ed.2d 192 (1969); *Ford v. Board of Managers,* 407 F.2d 937, 940 (3d Cir. 1969).

Although segregated confinement is not in itself unconstitutional, the cases do recognize that the facilities and programs available to segregated confinees in a particular correctional institution may be so shockingly inadequate as to constitute cruel and unusual punishment. *See, e. g., Finney*

*v. Hutto,* 410 F.Supp. 251, 274–78 (E.D.Ark. 1976), *aff'd,* 548 F.2d 740 (8th Cir.), cert. *granted,* 434 U.S. 901, 98 S.Ct. 295, 54 L.Ed.2d 187 (1977). During his testimony, Hoss did voice some complaints about the physical condition of his BAU cell—particularly the lack of a light fixture and the fact that the only lamp was in an outside corridor out of reach. His complaints, however, did not approach constitutional inadequacy. *Cf., e. g., Gates v. Collier,* 501 F.2d 1291, 1300–03 (5th Cir. 1974) (inadequate human waste disposal facilities, contaminated water, unsafe electric wiring, inadequate fire fighting equipment, etc.); *LaReau v. MacDougall,* 473 F.2d 974, 976–78 (2d Cir. 1972) (unlighted "strip cell" without sink or water fountain, hole in floor for human waste disposal flushable from outside of cell), *cert. denied,* 414 U.S. 878, 94 S.Ct. 49, 38 L.Ed.2d 123 (1973). Hoss also complained about the programs and services provided in the BAU, especially the lack of what he considers adequate rehabilitative services, but the record shows that he has been afforded the opportunity for exercise, education (his Spanish course), and access to work programs. In light of the obvious difficulties of providing such programs to segregated inmates in a maximum security area, I am not persuaded that these programs and services are constitutionally deficient. Courts have generally rejected cruel and unusual punishment claims based on inadequacy of rehabilitative services. *See, e. g., Newman v. Alabama,* 559 F.2d 283, 291 (5th Cir. 1977), *petition for cert. filed,* 46 U.S.L.W. 3650 (U.S., Apr. 6, 1978) (No. 77–1422); *French v. Heyne,* 547 F.2d 994, 1002 (7th Cir. 1976); *Smith v. Schneckloth,* 414 F.2d 680, 682 (9th Cir. 1969); *Padgett v. Stein,* 406 F.Supp. 287, 296–97 (M.D.Pa. 1975); *Smith v. Swenson,* 333 F.Supp. 1258, 1259–60 (W.D.Mo.1971); *Wilson v. Kelley,* 294 F.Supp. 1005, 1012–13 (N.D.Ga.) (three-judge court), *aff'd mem.,* 393 U.S. 266, 89 S.Ct. 477, 21 L.Ed.2d 425 (1968); *cf. Finney v. Arkansas Board of Correction,* 505 F.2d 194, 208–09 (8th Cir. 1974) (using lack of rehabilitative services as one factor in overall assessment of conditions); *Holt v. Sar-*

*ver,* 309 F.Supp. 362, 378–79 (E.D.Ark.1970) (same), *aff'd,* 442 F.2d 304 (8th Cir. 1971).

■ Hoss' primary cruel and unusual punishment argument is that his BAU confinement for an indefinite period of time is "without any continuing relation to a valid penal objective." Plaintiff's Supplemental Trial Memorandum (Doc. No. 41), at 22. In essence, this argument asserts that, in relation to any penological aims advanced in its support, Hoss' punishment is excessive and unjustified. *See Weems v. United States,* 217 U.S. 349, 362–82, 30 S.Ct. 544, 217 U.S. 349 (1910) (excessive punishment violates Eighth Amendment). As Justice Stewart observed in *Gregg, supra :*

> "Although we [the Supreme Court] cannot 'invalidate a category of penalties because we deem less severe penalties adequate to serve the ends of penology' [citation omitted], the sanction imposed cannot be so totally without penological justification that it results in the gratuitous infliction of suffering." 428 U.S. at 182–83, 96 S.Ct. at 2629 (plurality opinion); *cf. Furman, supra,* 408 U.S. at 279, 92 S.Ct. 2726 (Brennan, J., concurring) ("punishment is excessive . . . if it is unnecessary").

■ Hoss applies the excessive punishment argument both to his extended BAU confinement in general and to his deprivation of certain specific privileges while in the BAU. Although his argument on the matter of specific privileges is not entirely clear, Hoss apparently asserts that, even if BAU confinement is justified for such reasons as prison security, the punishment is excessive (and, therefore, unconstitutional) if he is also denied privileges (such as certain recreational opportunities or work programs) in the BAU and the denial is not independently justifiable on security grounds. Hoss cites *Battle v. Anderson,* 376 F.Supp. 402, 424 (E.D.Okla.1974), which states:

> "Prisoners held in segregation for security or other non-disciplinary reasons

must be provided as many of the privileges enjoyed by the general population as the nature of their confinement allows."

I question the broad implications of this rule insofar as it allows courts to supercede administrative judgment not just as to such major decisions as imposition of segregated confinement but as to such day-to-day matters of prison operation as furnishing of cleaning supplies, meal locations, and shower schedules. *See Nadeau v. Helgemoe,* 561 F.2d 411, 413–17 (1st Cir. 1977), *vacating in part,* 423 F.Supp. 1250 (D.N.H.1976). In any event, Hoss has not identified any specific privileges denied to him in the BAU which are unrelated to the reasons for his BAU confinement. As already noted, while in the BAU, Hoss has been afforded some recreational, educational, and work-related opportunities. The privileges withheld from him (*e. g.,* participation in athletic contests) relate largely to group activities, deprivation of which are "inescapable accompaniments of segregated confinement." *Sweet v. South Carolina Department of Corrections,* 529 F.2d 854, 861 (4th Cir. 1975); *see Johnson v. Anderson,* 370 F.Supp. 1373, 1387 & n. 27 (D.Del.1974), *remanded in part on other grounds,* Nos. 74–1822 & 74–1930 (3d Cir. Apr. 29, 1975). Hoss therefore has no valid claim of excessive punishment for unjustifiable deprivation of privileges during confinement to the BAU.

To determine whether Hoss' prolonged segregated confinement is in itself excessive punishment, I must ascertain the specific reasons why Hoss is so confined. In discussing this issue, counsel have disputed whether Hoss' confinement status is "punitive" or "administrative." [10] The legal significance of such labels has been questioned (*see Allen v. Nelson,* 354 F.Supp. 505, 511 (N.D.Cal.), *aff'd per curiam,* 484 F.2d 960 (9th Cir. 1973)), but in this case use of the distinction may help to define the reasons for Hoss' segregation and the type of inquiry to be undertaken in judging the pro-

---

10. As noted in the findings, SCI Graterford has used the BAU for both administrative and punitive (or "disciplinary") confinees and apparent-

ly continues to do so despite the distinction made in the 1977 amendments to Administrative Directive No. 801.

priety of defendants' decision to so confine him. If Hoss' BAU confinement is "punitive"—*i. e.*, ordered as punishment for a specific act committed by him—Eighth Amendment analysis of excessiveness of the punishment focuses on the relationship between the seriousness of the act committed and the degree of hardship imposed by the physical condition of the confinement quarters, and, in this context, the duration of confinement "helps to gauge the cumulative burden of the deprivations that the inmate has endured." *Johnson v. Anderson,* 370 F.Supp. 1373, 1386–88 (D.Del.1974), *remanded in part on other grounds,* Nos. 74–1822 & 74–1930 (3d Cir., Apr. 29, 1975). Such an analysis is not warranted in this case, however, for Hoss has not been confined to the BAU for punitive reasons.

Hoss is imprisoned for the murders that he committed,[11] but BAU confinement is not a part of the sentences imposed on him for those murders. Hoss' present period of BAU confinement dates to August 1972, when he was implicated in the stabbing of an inmate at SCI Pittsburgh and was ordered confined to the BAU by SCI Pittsburgh officials; these defendants, SCI Graterford officials, have no responsibility for that action.

■■■■■ Hoss' BAU confinement at SCI Graterford initially was the result of that institution's policy of placing incoming prisoners in the same housing category as that which they had at the transferor institution. Following review of Hoss' situation, the subsequent continued BAU confinement was the result of defendants' decision that

segregation of Hoss from other inmates and location of Hoss in a high security area was necessary to prevent possible violence. Although Hoss' commission of prison misconduct while at SCI Graterford was a factor which contributed to the decision to keep Hoss so confined, it was not activity for which the defendants imposed BAU confinement on Hoss as a disciplinary measure. In this sense, therefore, the decision to maintain Hoss' confinement to the BAU was primarily "administrative," rather than "punitive." The controlling question, therefore, is whether Hoss' indeterminate confinement to the BAU for such administrative reasons is constitutionally forbidden.[12]

■■■ In assessing the propriety of segregated confinement in a particular case, courts often have deferred to the judgment of prison officials. Segregation has been viewed as a legitimate tool for use by prison authorities, and wide discretion has been permitted those authorities in using that tool. That discretion has extended to imposition of segregated confinement for a lengthy, and even an indefinite, period of time. *See, e. g., Sweet v. South Carolina Department of Corrections,* 529 F.2d 854, 861–62 (4th Cir. 1975); *O'Brien v. Moriarty,* 489 F.2d 941, 944–45 (1st Cir. 1974); *Adams v. Carlson,* 488 F.2d 619, 634–36 (7th Cir. 1973); *Sostre v. McGinnis,* 442 F.2d 178, 190–94 (2d Cir. 1971), *cert. denied,* 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 & 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972); *Mayberry v. Robinson,* 427 F.Supp. 297, 309 (M.D.Pa.1977). Where, as here, the prison authorities have imposed segregation

---

11. As set forth in the findings of fact, Hoss is serving a life sentence imposed in 1972 for first degree murder and an additional ten to twenty year sentence imposed in 1974 for the second degree murder committed at SCI Pittsburgh.

12. I hasten to note that the fact that Hoss' BAU confinement was not imposed as punishment for any specific activity does not take this case outside the ambit of the cruel and unusual punishment prohibition. In *Ingraham v. Wright,* 430 U.S. 651, 664–71, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977), the Supreme Court held that the ban on cruel and unusual punishment applies only to criminal matters. The Court's decisions make clear, however, that the prohi-

bition applies to any acts committed while a person is undergoing punishment for a crime, even though those specific acts may not be committed for punitive purposes. *See, e. g., Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (deliberate indifference to prisoners' serious medical needs constitutes cruel and unusual punishment). *See also Landman v. Royster,* 333 F.Supp. 621, 646 (E.D.Va.1971). Certainly, excessively restrictive confinement of a person imprisoned for a crime may violate the constitutional prohibition even though the excessive restrictions are imposed for purely administrative reasons.

to serve such institutional objectives as prevention of violence, rather than merely to punish the confined prisoner for specific misconduct, the degree of deference to administrative judgment has been great indeed. For example, in *Graham v. Willingham,* 384 F.2d 367 (10th Cir.), aff'g, 265 F.Supp. 763 (D.Kan.1967), a case very similar to this one, the Court of Appeals for the Tenth Circuit rejected the cruel and unusual punishment contention of a prisoner who had been kept in segregated confinement for over two years. Although his conduct in segregation was "entirely satisfactory," the prisoner had been involved in violent incidents when in the general prison population, and he then had been placed in segregation "not . . . as a disciplinary control for specific misconduct but as an administrative control relating to inmates considered to be a 'threat to themselves, to others, or to the safety and security of the institution.'" 384 F.2d at 368, quoting Bureau of Prisons Policy Statement. In affirming the district court's denial of relief, the Court of Appeals stated:

"The basic responsibility for the control and management of penal institutions, including the discipline, treatment and care of those confined, lies with the Attorney General and is not subject to judicial review unless exercised in such a manner as to constitute clear arbitrariness or caprice upon the part of prison officials. . . .

. . . [The prison bureau's policy of administrative segregation] is perfectly proper and lawful and its administration requires the highest degree of expertise in the discretionary function of balancing the security of the prison with fairness to the individuals confined. In the case at bar the record reveals that appellant's confinement in segregation is the result of the considered judgment of the prison authorities and is not arbitrary.

. . . [T]he trial court was manifestly correct in determining that appellant has been denied no constitutional right and that the determination of whether appellant presently should be considered a threat to others or the safety or security

of the penitentiary is a matter for administrative decision and not the courts." 384 F.2d at 368.

■ These cases establish that so long as segregation is imposed in a reasonable effort to attain such legitimate administrative objectives as prison security the punishment is not excessive or unjustified. *See Allen v. Nelson,* 354 F.Supp. 505, 511–12 (N.D.Cal.), aff'd per curiam, 484 F.2d 960 (9th Cir. 1973), quoting *Landman v. Royster,* 333 F.Supp. 621, 645 (E.D.Va.1971). The question here, then, is whether the defendants have had a reasonable basis for concluding that Hoss must be confined to the BAU to further legitimate administrative objectives. *Cf. Allen, supra,* 354 F.Supp. at 512 (the prison officials' decision "must be bottomed on a showing of a reasonable relationship between the necessity to limit the liberty of the prisoner and the accomplishment of a legitimate penal aim"). I conclude that throughout the period of Hoss' incarceration at SCI Graterford, the defendants have had a reasonable basis for their actions.

The primary reason given by the SCI Graterford defendants for Hoss' continued segregated confinement is security; they believe that he presents a danger of violent injury to himself and to other persons in the institution. I have reviewed Hoss' record in detail in the findings of fact. That record discloses Hoss to be a man who has considerable difficulty controlling his temper and whose lack of self-control often does lead to violence. This assessment of Hoss is confirmed by the various psychiatric reports and is vividly illustrated by the numerous violent incidents which have marked Hoss' life, some of which have occurred during Hoss' incarceration at SCI Graterford. In light of this situation, I cannot say that defendants' actions in continuing Hoss in segregated confinement are unreasonable.

It is true that apparently there has been some improvement in Hoss' condition since his transfer to SCI Graterford in 1974. His interest in such "programming" activities

as ceramics and the Spanish course is encouraging, as is his janitorial job, which allows him to get out of his cell each day. These favorable developments certainly should be taken into consideration by defendants in determining whether continued BAU confinement is warranted, but they are not so dramatic and definitive as to lead me to conclude that the decision to continue BAU confinement is unreasonable. Hoss' flare-ups have continued, and although many of these incidents might be attributable to frustration caused by his present situation, they nevertheless can be seen as signs of a continuing lack of self-control. SCI Graterford officials reasonably could conclude that, despite some recent improvement, Hoss has not yet made a behavioral adjustment sufficient to enable him to avoid violent incidents and, therefore, that Hoss' removal from potentially inflammatory situations in the general prison population or in B Gallery continues to be a necessary preventive measure.

One additional factor worthy of discussion in this portion of the opinion is the racial situation at SCI Graterford. The defendants certainly would be justified in believing that Hoss' regular use of the epithet "nigger" to refer unfavorably to persons can create a highly inflammatory situation, particularly in a predominantly black institution such as SCI Graterford. I suspect that the situation would not be significantly cooled by Hoss' protestations that he did not intend the name as a racial epithet. Hoss' asserted lack of prejudice against black people does not alter the fact that he engages in name-calling which is racially inflammatory. This factor lends additional support to the conclusion that defendants have acted reasonably in confining Hoss to the BAU.

In summary, having independently assessed those factors which form the basis for Hoss' continued segregated confinement, I conclude that defendants' decision to keep Hoss so confined is justified. Both now and throughout the period of Hoss' incarceration at SCI Graterford,[13] there has been a reasonable basis for defendants' decision to keep Hoss restricted to the BAU. Since the decision was justified, Hoss has not been subjected to cruel and unusual punishment.

The limited nature of this holding should be emphasized. My task is only to assess the reasonableness of defendants' conduct. Whether defendants have made the best decision or the most nearly correct one is not for me to determine. This record contains a number of conflicting views as to how best to handle Hoss' situation. For example, while Dr. Tapolow insists that transfer to another institution is advisable in order to avoid psychological deterioration, Dr. Sadoff does not believe that a transfer is necessary at this time and Dr. Rundle contends that continued segregation will cause Hoss' condition to worsen regardless of the institution in which he is confined. The disparate views support the conclusion that defendants have not acted unreasonably; it is for defendants to assess the various viewpoints and determine which of them should be followed. The most important questions relating to Hoss—e. g., whether he has now achieved the capability to live outside of the BAU without becoming involved in violent incidents; whether, as Dr. Rundle asserts, continued segregated confinement will be counterproductive— deal with matters reserved to the informed discretion of prison personnel, who, in answering them must consider not only Hoss' own welfare, but the welfare and safety of the entire prison population. For purposes of this case, I merely hold that defendants' exercise of their discretion in confining Hoss to the BAU has not been unreasonable and, therefore, that Hoss' punishment is not unconstitutional. I express no opinion as to

13. The analysis in the text focuses on conditions as they exist today. As the text notes, in some respects Hoss' attitude and behavior patterns seem to have improved since he was transferred to SCI Graterford in 1974. Since I have held that even under today's conditions defendants are justified in keeping Hoss confined to the BAU, it follows that defendants also were justified in so confining Hoss during earlier periods of his incarceration when his behavior presented even more visible cause for concern.

whether some other course of action would have been more appropriate.

### B. Procedural Due Process

[18–20] Hoss contends that the procedures employed by defendants during his confinement to SCI Graterford's BAU are so inadequate that they violate the Fourteenth Amendment's prohibition against deprivations of life, liberty, or property without due process of law.[14] As the Supreme Court noted in *Ingraham v. Wright,* 430 U.S. 651, 672, 97 S.Ct. 1401, 1413, 51 L.Ed.2d 711 (1977)—

> "Application of this prohibition requires the familiar two-stage analysis: We must first ask whether the asserted individual interests are encompassed within the Fourteenth Amendment's protection of 'life, liberty or property'; if protected interests are implicated, we then must decide what procedures constitute 'due process of law.'"

 As to the first stage of this analysis, since Hoss is not being deprived of his life and makes no claim of deprivation of property, the inquiry in this case focuses on whether Hoss has been deprived of a "liberty" interest. The cases recognize that "liberty" is a broad, but not all-encompassing term which applies to those basic interests which are possessed by citizens of a free society and to those additional interests which are created by the state for the benefit and enjoyment of its people. *See, e. g., Ingraham, supra,* at 672–73, 97 S.Ct.

1401; *Wolff v. McDonnell,* 418 U.S. 539, 555–58, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Board of Regents v. Roth,* 408 U.S. 564, 572, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). Whether specific interests are within the ambit of that term is often a difficult question,[15] and the difficulty is compounded when the interests relate to prisoners. By its very nature, imprisonment entails the withdrawal from prisoners of liberties possessed by others in society. *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 125–26, 129–30, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977); *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974); *Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948). It has been recognized, however, that this withdrawal is not total; some prisoners' liberties do remain. *See, e. g., Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); *Wolff v. McDonnell,* 418 U.S. 539, 555–56, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Cruz v. Beto,* 405 U.S. 319, 321–22, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). *See generally Gittlemacker v. Prasse,* 428 F.2d 1, 3–4 (3d Cir. 1970).

 The liberty interests implicated in this case have not been precisely articulated. From their trial brief, it appears that defendants believe that one of the interests asserted by Hoss is the right not to be transferred to a different state correctional

---

14. Hoss also seems to argue that he has been deprived of due process because defendants are acting arbitrarily and irrationally. In addition to its procedural requirements, the Due Process Clause contains a substantive component which prohibits deprivations of life, liberty, or property if they are not rationally related to the attainment of legitimate governmental objectives. *McKnight v. Southeastern Pa. Transp. Auth.,* 438 F.Supp. 813, 825 (E.D.Pa.1977), *appeal docketed,* No. 77–2563 (3d Cir., Dec. 13, 1977); *see* note 9 *supra.* The objective sought to be obtained by Hoss' confinement in the BAU—prison security—certainly is a legitimate one. *Pell v. Procunier,* 417 U.S. 817, 823, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). The assertion that Hoss' segregated confinement is not rationally related to that objective·is based on the contention that his record does not rea-

sonably support a conclusion that he is a security risk. In the portion of this opinion discussing cruel and unusual punishment I have held that it is reasonable to treat Hoss as a security risk. That holding disposes of the substantive due process claim.

15. *See, e. g., Smith v. Organization of Foster Families for Equality & Reform,* 431 U.S. 816, 838–47, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977) (foster family rights); *Paul v. Davis,* 424 U.S. 693, 699–712, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) (reputation); *New Motor Vehicle Board v. Orrin W. Fox Co.,* 434 U.S. 1345, 1347–50, 98 S.Ct. 359, 54 L.Ed.2d 439 (Rehnquist, Circuit Justice, 1977) (business interests), *prob. juris. noted,* 434 U.S. 1060, 98 S.Ct. 1230, 55 L.Ed.2d 760 (1978).

institution (*i. e.*, to SCI Graterford from SCI Huntingdon). I am not sure that this interest is being advanced by Hoss, but, in any event, I conclude that under *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), and *Montanye v. Haymes,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976), Hoss has no liberty interest with respect to interprison transfer. Those cases hold that such a liberty interest can only arise by virtue of state law, and the record in this case contains no evidence of a right not to be transferred to a different prison under Pennsylvania statutes or administrative regulations.

In support of his contention that he has been deprived of a liberty interest, Hoss cites *Gray v. Creamer,* 465 F.2d 179 (3d Cir. 1972), in which the Third Circuit Court of Appeals held that "transfer of a prisoner from the general prison population to solitary confinement without either notice of the charges or a hearing does not . . . meet minimal due process requirements." 465 F.2d at 185 (footnote omitted); *accord, United States ex rel. Tyrrell v. Speaker,* 471 F.2d 1197 (3d Cir. 1973). In rendering this holding, the court quoted the Second Circuit's statement in *Sostre v. McGinnis,* 442 F.2d 178, 198 (2d Cir. 1971), *cert. denied,* 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 & 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972), that "[i]f substantial deprivations are to be visited upon a prisoner, it is wise that such action should at least be premised on facts rationally determined." 465 F.2d at 185. This conclusion appears to have been undermined by the Supreme Court's rulings in *Meachum* and *Montanye, supra.* In *Montanye,* in reversing a Second Circuit ruling that a disciplinary transfer to a prison having harsher conditions implicated a liberty interest, the Supreme Court stated:

"As long as the conditions or degree of confinement to which the prisoner is subjected are within the sentence imposed upon him and are not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an in-

mate's treatment by prison authorities to judicial oversight. The Clause does not require hearings in connection with transfers whether or not they are the result of the inmate's misbehavior or may be labeled as disciplinary or punitive." 427 U.S. at 242, 96 S.Ct. at 2547.

Furthermore, in *Meachum* the Court explained:

"Our cases hold that the convicted felon does not forfeit all constitutional protections by reason of his conviction and confinement in prison. He retains a variety of important rights that the courts must be alert to protect. See *Wolff v. McDonnell,* 418 U.S. [539,] 556 [94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974)], and cases there cited. But none of these cases reaches this one; and to hold as we are urged to do that *any* substantial deprivation imposed by prison authorities triggers the procedural protections of the Due Process Clause would subject to judicial review a wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts." 427 U.S. at 225, 96 S.Ct. at 2538. (emphasis in original).

█ Despite the Court's broad language, however, the opinions in *Meachum* and *Montanye* explicitly recognized that, while the Due Process Clause "in itself" created no liberty interests with respect to confinement conditions or degree, such interests could arise under state law. *See Meachum,* 427 U.S. at 225–27, 96 S.Ct. 2532; *Montanye,* 427 U.S. at 243, 96 S.Ct. 2543. In my view, Administrative Directive No. 801, which, as detailed in the findings of fact, provides that BAU confinement may be imposed only in limited specific situations and that a BAU confinee shall be released to the general prison population "as soon as feasible" (original Directive, ¶ VI.D.) or "as soon as appropriate" (amended Directive, ¶ VI.C. [to be codified at 37 Pa.Code § 95.107(c)]),[16] establishes a liberty interest in freedom from segregated

---

**16.** Although Directive 801 is a set of regulations promulgated by the Bureau of Correction,

I have found no indication that the original (1974) version of the Directive was published in

confinement and its harsh accompaniments [17] under the law of Pennsylvania. *Cf. Meachum,* 427 U.S. at 226, 96 S.Ct. at 2539 ("Massachusetts law conferred no right on the prisoner to remain in the prison to which he was initially assigned, defeasible only upon proof of specific acts of misconduct"); *Walker v. Hughes,* 558 F.2d 1247, 1250–56 (6th Cir. 1977) (limited freedom from segregated confinement arose under federal prison policy statements); *Saunders v. Packel,* 436 F.Supp. 618, 623 (E.D.Pa.1977) (freedom from prison-wide lock-ups arose under general SCI Graterford practices); *Wright v. Enomoto,* No. C–73–1422 SAW, slip op. at 9 (N.D.Cal., Sept. 30, 1976) (three-judge court) (freedom from segregated confinement arose under state prison regulations), *aff'd mem.,* 434 U.S. 1052, 98 S.Ct. 1223, 55 L.Ed.2d 756 (1978). It is this state law liberty interest that is being denied in this case.

■ Defendants contend that no deprivation of Hoss' liberty occurred at SCI Gra-

terford because Hoss had already been confined to the BAU before his transfer to that institution and he thus lost nothing more at SCI Graterford than that of which he had already been deprived. If Hoss had been confined to the BAU for disciplinary reasons, there might be some validity to that analysis in that confinement status and duration would have been finally and definitively determined at a disciplinary hearing. *Cf. Meachum, supra,* 427 U.S. at 224, 96 S.Ct. at 2538 ("given a valid conviction [here, a valid determination that prison discipline is warranted], the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him"). As the defendants have emphasized, however, Hoss' BAU confinement is for administrative reasons. As such, Hoss is enduring a continuing deprivation of his liberty which is permissible only if administrative justifications continue to exist. As the Eighth Circuit Court of Appeals observed in *Kelly v. Brewer,* 555 F.2d 394, 400 (8th Cir. 1975):

the Pennsylvania Bulletin or incorporated into the Pennsylvania Code. Under the Commonwealth Documents Law, Act No. 240, §§ 301 *et seq.,* 1968 Pa.Laws 769, as amended (*repealed,* Act of July 9, 1976, Act No. 160, § 7, 1976 Pa.Laws 877), which was in effect when the Directive was adopted, and under its successor statute, 45 Pa.C.S.A. §§ 501 *et seq.,* lack of publication may affect the validity or effectiveness of regulations. The parties have not raised this question, however, and I shall assume, as they have, that the original Directive was valid. In any event, the subject matter of the Directive appears to correspond to similar regulations adopted on September 22, 1972 (2 Pa.Bull. 1771) and codified at 37 Pa.Code §§ 95.101–.107 (serial pp. 10893–99, Master Transmittal Sheet No. 11, 1973), and, as I interpret those regulations, they also created a liberty interest. Paragraph VII.B. of the 1972 regulations, 37 Pa.Code § 95.107(b), provided that the "sole purpose" of BAU confinement was to control an inmate's behavior "until such time as he may be safely removed" and prohibited restrictions "beyond those necessary for security." Paragraph VII.D., 37 Pa.Code § 95.107(d), required the Program Review Committee to release a BAU confinee "as soon as diagnostically feasible."

The amended (1977) version of Directive 801 was published in the Bulletin (6 Pa.Bull. 3161 (1976) (notice of proposed rule making); 7 Pa. Bull. 442 (1977) (notice of adoption of regulations)) and is scheduled to be codified at 37

Pa.Code §§ 95.101–.108, replacing and superceding the codified 1972 regulations.

17. In his *pro se* complaint, Hoss stressed the denial of his "right to rehabilitation." In the sense that denial of access to group rehabilitative activities may be one of the accompaniments of segregated confinement, this interest may be implicated in this case. Whether there is a more general "right to rehabilitation" is questionable. *See, e. g., Newman v. Alabama,* 559 F.2d 283, 291 (5th Cir. 1977), *petition for cert. filed,* 46 U.S.L.W. 3650 (U.S., Apr. 6, 1978) (No. 77–1422); *Wilson v. Kelley,* 294 F.Supp. 1005, 1012–13 (N.D.Ga.) (three-judge court), *aff'd mem.,* 393 U.S. 266, 89 S.Ct. 477, 21 L.Ed.2d 425 (1968). Rehabilitation is a relatively recent addition to criminal correction policy and the continuing controversy which surrounds it makes its status as a constitutional "liberty" doubtful. *See generally* Symposium: Law and Correctional Process in Washington, 51 Wash.L.Rev. 491 (1976) (discussing controversy over emphasis on rehabilitative policies in one state's correctional system). I have particular doubts that a liberty interest in rehabilitation exists in this case, where Hoss has been validly sentenced to spend the remainder of his life in prison, apart from the rest of society. I see no need to resolve this question now, however, since I do not believe that recognition of a "right to rehabilitation" will significantly alter the due process analysis employed in this case.

"While . . . administrative segregation is not inherently unconstitutional, its validity depends upon the relative humaneness of the conditions of the segregated confinement and in individual cases upon the existence of a valid and subsisting reason or reasons for the segregation, such as protection of the segregated inmates from other inmates, protection of other inmates and prison personnel from the segregated inmates, prevention of escapes and similar reasons. . . . Moreover, it should be emphasized that the reason or reasons for the segregation must not only be valid at the outset but must continue to subsist during the period of the segregation. Conditions in prisons change as they do everywhere else, and a reason for administrative segregation of an inmate that is valid today may not necessarily be valid six months or a year in the future."

Since Hoss' liberty deprivation is a continuing one, it is implicated in this case.

Proceeding to the second stage of the due process inquiry, I must determine what process is "due". In *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), the Supreme Court specified certain procedures which must attend prison disciplinary actions. *See also Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976). Recently, the Court extended these requirements to proceedings governing the initial placement of inmates in administrative segregation. *Enomoto v. Wright,* 434 U.S. 1052, 98 S.Ct. 1223, 55 L.Ed.2d 756 (1978), *aff'g mem.* No. C–73–1422 SAW (N.D.Cal., Sept. 30, 1976) (three-judge court). *Wolff* does not have retroactive application, however (418 U.S. at 573–74, 94 S.Ct. 2963; *accord, Cox v. Cook,* 420 U.S. 734, 95 S.Ct. 1237, 43 L.Ed.2d 587 (1975) (per curiam)), and the parties agree that it does not apply to this case.[18] Indeed, since Hoss' initial placement in segregation occurred at SCI Pittsburgh and this case deals only with the actions of SCI Graterford officials, the procedures

afforded Hoss during his initial placement in the BAU are not at issue here. Instead, the question is what procedures must accompany the decision to *continue* Hoss' prolonged confinement in the BAU.

■ The nature of a procedural due process inquiry was outlined by the Supreme Court in *Carey v. Piphus,* 435 U.S. 247, 259, 98 S.Ct. 1042, 1050, 55 L.Ed.2d 252 (1978):

"[The Due Process] Clause 'raises no impenetrable barrier to the taking of a person's possessions,' or liberty, or life. *Fuentes v. Shevin,* 407 U.S. 67, 81 [92 S.Ct. 1983, 1994, 32 L.Ed.2d 556] (1972). Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property. Thus, in deciding what process constitutionally is due in various contexts, the Court repeatedly has emphasized that 'procedural due process rules are shaped by the risk of error inherent in the truth-finding process . . .' *Mathews v. Eldridge,* 424 U.S. 319, 344 [96 S.Ct. 893, 907, 47 L.Ed.2d 18] (1976). [Footnote omitted.] Such rules 'minimize substantively unfair or mistaken deprivations of' life, liberty, or property by enabling persons to contest the basis upon which the State proposes to deprive them of protected interests. *Fuentes v. Shevin, supra* [407 U.S.], at 81 [92 S.Ct., at 1994]."

Necessarily, the specific dictates of procedural due process vary with each fact situation. *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). In *Mathews v. Eldridge,* 424 U.S. 319, 334–35, 96 S.Ct. 893, 903 (1976), the Court identified appropriate touchstones for dealing with the problem:

"[O]ur prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an

---

**18.** *Wolff* was decided on June 26, 1974. Hoss initially was placed in the BAU at SCI Pittsburgh in 1972 and has been in the BAU at SCI

Graterford since his transfer to that institution on June 19, 1974.

erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Accord, Smith v. Organization of Foster Families for Equality & Reform,* 431 U.S. 816, 848–49, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977); *Ingraham v. Wright,* 430 U.S. 651, 675, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977); *cf. Board of Curators v. Horowitz,* 435 U.S. 78, 86 & n. 3, 98 S.Ct. 948, 953 & n. 3, 55 L.Ed.2d 124 (1978).

Hoss' private liberty interest has already been discussed. That interest derives from state regulations granting prisoners the right not to be subjected to segregated confinement unless it is necessary for administrative control. Hoss is suffering deprivation of the liberty for a prolonged, indefinite period of time. The severity of this deprivation is emphasized by expert testimony in this case that Hoss' prolonged isolation in the BAU may cause psychological damage. From all that has been said, it is readily apparent that the liberty interest in freedom from segregated confinement is keyed to the nonexistence of reasons to impose such confinement. Indeed, I have already stated that if such reasons did not exist, the confinement would constitute cruel and unusual punishment.

▇▇▇ The procedures presently employed in keeping Hoss in the BAU are detailed in the findings of fact. Their main feature is the monthly [19] status evaluation by the Program Review Committee and, prior to May 1975, by the Behavior Clinic.[20]

**19.** Directive 801 has required weekly review by the Program Review Committee of the status of inmates held in the BAU or administrative custody. Amended Directive, ¶ III.G.3. [to be codified at 37 Pa.Code § 95.103(g)(3)]; original Directive ¶ III.I.3. *See also* original Directive, ¶ III.I.4 (requiring biweekly reviews in certain cases). Hoss points out that the record does not show that this requirement has been complied with, but I do not understand him to argue that this failure is a constitutional violation. A state may grant procedural rights that exceed constitutional requirements. Violation of those procedures by the state would be wrongful, but would not offend the Constitution. *See, e. g., United States ex rel. Hayward v. Johnson,* 508 F.2d 322, 329–30 (3d Cir.), *cert. denied,* 422 U.S. 1011, 95 S.Ct. 2637, 45 L.Ed.2d 675 (1975); *Adams v. Wainwright,* 445 F.2d 832 (5th Cir.), *cert. denied,* 404 U.S. 860, 92 S.Ct. 160, 30 L.Ed.2d 103 (1971); *cf. United States ex rel. Dean v. Johnson,* 381 F.Supp. 495, 497–98 (E.D.Pa.1974) (dealing with prison mail regulations). The test of constitutional inadequacy must be whether the evaluations conducted by the Program Review Committee have been so infrequent that there is a risk that Hoss will be confined to the BAU for a time greater than necessary while awaiting the next review. The factors that must be evaluated in determining whether to continue Hoss' BAU confinement are not of a type that will change dramatically in a few weeks; rather, if they change at all, they will do so gradually over an extended time period. The frequency of evaluations at SCI Graterford—generally, one per month—has been sufficient to allow detection of gradual changes in Hoss' behavior and personality that should have a bearing on whether he should remain segregated. The time interval between evaluations has not been so great as to pose a significant danger of lengthy delay before detection of changes that would compel release. In other fact situations, due process may require more frequent evaluations, but in this case the frequency has satisfied constitutional requirements. Since this litigation deals only with constitutional violations, defendants' failure to comply with state regulations on frequency of evaluations does not entitle Hoss to relief in this case.

**20.** One other feature of these procedures deserves brief comment. For the first five days after his transfer to SCI Graterford, Hoss did not receive a hearing with respect to his BAU confinement status. He was restricted to the BAU as a result of the SCI Graterford policy of placing newly transferred inmates in the same housing category as that which they occupied in the prison from which they were transferred. I do not believe that this policy violated procedural due process requirements. This was not Hoss' initial placement in the BAU since he had already been so confined at SCI Huntingdon, and the only question, therefore, was whether *continued* BAU confinement was warranted now that Hoss had been transferred to a different institution. The SCI Graterford policy makes a presumption that such continued confinement is warranted for the short period of time until a Behavior Clinic review can be held. While that presumption may be in error, it certainly is not without some factual basis, since it is reasonable to assume that the transferor institution had made a prior determina-

It appears from the progressively more detailed reports filed by these bodies that the quality of these reviews has improved considerably and that they have evolved from mere opportunities for Hoss to register his complaints to somewhat more meaningful assessments of Hoss' present condition.[21] Nevertheless, there is a risk that, despite these reviews, Hoss will have deprivation of his liberty continued erroneously. In a case such as this, where segregated confinement is being imposed over an extended and indefinite period of time, certain additional safeguards would help to eliminate this danger.

As emphasized by Hoss, the most glaring defect in the present system is the fact that, although the Program Review Committee's function is to determine whether Hoss has made a sufficient behavioral adjustment to allow his release from the BAU, the committee members have not agreed upon any objective criteria for making that determination.[22] Of course, the decision to release Hoss is committed to the committee's judgment, and to some extent it may depend on subjective evaluations of Hoss' condition by committee members. The lack of specifically delineated considerations for use in making those evaluations, however, poses the risk that the decision will be based on personal bias or other factors not proper for consideration or that the decision will not take into account factors which should be part of the assessment. Clearly, identification of objective criteria for making the decision will alleviate this risk. *Kelly v. Brewer*, 378 F.Supp. 447, 455 (S.D.Iowa 1974), *aff'd*, 525 F.2d 394 (8th Cir. 1975).

A second defect in the present procedure concerns the information provided to Hoss about his confinement status. Hoss notes that he is unable to make a meaningful presentation to the committee of reasons why he should be released from the BAU since he has never been provided with any guidelines as to what factors will be considered in making that determination; the only explanation given him about his continued confinement is that he is a "security case." "The fundamental requisite of due process of law is the opportunity to be heard" (*Grannis v. Ordean*, 234 U.S. 385, 394, 34 S.Ct. 779, 783, 58 L.Ed. 1363 (1914), *quoted in Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950)), and that opportunity must be a meaningful one. *Bell v. Burson*, 402 U.S. 535, 542–43, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971). Providing Hoss with information as to what factors will be used to determine whether to continue BAU confinement will better enable him to make his case to the committee, and exposure to Hoss' informed views will add to the com-

---

tion that BAU confinement of the transferred inmate was warranted. While the risk of erroneous deprivation of the prisoner's rights would be reduced if he were given an immediate hearing upon his transfer or if he were placed in general population subject to a later determination as to proper confinement status, these alternatives would too greatly infringe on the state's interest in maintaining prison security, particularly since they would prevent the state from making a determination of confinement status after having an opportunity to observe the transferred inmate. So long as the initial period of BAU confinement is short, as it was in this case, I believe that use of the presumption is constitutional.

**21.** In this connection I note that in general there appears to have been a recent increased awareness of inmates' due process rights on the part of prison authorities. For example, in announcing the 1977 amendments to Directive 801, Commissioner Robinson stated:

"The purpose of these amendments is to review procedures for disciplinary action and the utilization of restricted housing categories to, among other things, conform with procedures established by recent judicial interpretation of minimal due process."
6 Pa.Bull. 3161 (1976).

**22.** At trial, defendant Mauger testified as follows in response to a question by the Court:

"THE COURT: [H]as the committee ever defined for itself what it is looking for in Mr. Hoss that would cause the committee to determine that he is eligible to return to the general population.

THE WITNESS: As of this point now, sir, no, we have not. We have talked about different programs that we tried to get him involved in, but we have not discussed his release from BAU as a committee. No."
N.T. 123.

mittee's perspectives in making an informed judgment as to Hoss' status, thereby further lessening the risk of error. *See Fuentes v. Shevin*, 407 U.S. 67, 81, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972).

The risk of error would also be alleviated by presentation to the committee of relevant data from sources other than Hoss. In particular, the committee would be aided by periodic reports as to Hoss' psychological condition. Although the committee has reviewed such reports when they were available, it has never ordered psychological evaluations of Hoss to aid in its determination of his confinement status.[23] The record shows that evaluations of Hoss' psychological condition have been sporadic and infrequent. That condition goes to the very reason for Hoss' segregated confinement, however, and it is difficult to understand how the committee can make an informed decision that Hoss needs such confinement without expert opinion as to whether the confinement is warranted. Of course, as Dr. Sadoff's report points out, medical opinion may not be determinative, but certainly it would be an important factor in assessing Hoss' behavioral adjustment.

Although present risks of erroneous deprivation of Hoss' liberty and means of alleviating those risks have been identified, the due process analysis of *Mathews v. Eldridge, supra*, requires that government interests be taken into account before a procedure is held constitutionally defective. In this case, those interests are obvious. As the Supreme Court commented in *Procunier v. Martinez*, 416 U.S. 396, 404–05, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974), "the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree." Because of these problems, "wide-ranging deference" has been accorded prison officials' decisions. *Jones v. North Caro-*

*lina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 126, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977). Although a concern in this case has been the danger of erroneous deprivation of Hoss' liberty, another concern must be the danger of error in releasing Hoss from the BAU when he still has violent behavior problems. Certainly, the risk which Hoss poses to prison security is entitled to heavy consideration. *See, e. g., Saunders v. Packel*, 436 F.Supp. 618, 625 (E.D.Pa.1977). The administrative burden imposed by the added procedures should also be taken into account. *See Ingraham v. Wright*, 430 U.S. 651, 680–81, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977); *Mathews, supra*, 424 U.S. at 347–48, 96 S.Ct. 893.

Defendants have offered no viable justification for their failure to formulate objective guidelines for determination of whether Hoss' BAU confinement should be continued. While formulation of such guidelines may impose some burden on Program Review Committee members, that burden is minimal and surely is outweighed by the benefits such guidelines will provide in eliminating the possibility of unfairness and arbitrariness. I therefore hold that they are an essential requirement of due process in this case. *Accord, Kelly v. Brewer, supra*, 378 F.Supp. at 455. This does not mean that the committee members cannot use their subjective judgment. It merely means that that judgment must relate to agreed-upon criteria rather than unfocused personal views.

Defendants have objected to being required to inform Hoss of specific guidelines because, as defendant Reid testified, they fear that Hoss would superficially pattern his behavior to meet the specific standards provided without making the underlying behavioral adjustment required to live outside of the BAU. The concern apparently is that once Hoss patterns his conduct to

---

**23.** The committee's conduct has comported with ¶ III.G.4. of the amended version of Directive 801 [to be codified at 37 Pa.Code § 95.103(g)(4)], which only requires that the committee review "psychological and psychiatric reports when available." The original version of the Directive was silent as to what data

the committee was to use in making its confinement status determination. Under ¶ III.G.4. of the amended Directive, psychological and psychiatric examinations now must be given annually; the record does not contain evidence that defendants have complied with this requirement.

the objective standards, it will be impossible to ascertain whether a true behavioral adjustment has occurred. While I recognize that this may be a make-weight argument, I am willing to defer to the opinion of the persons who have been working with Hoss since his 1974 transfer to SCI Graterford that this concern is a legitimate one. I therefore do not hold that Hoss must be given specific standards to meet. Nevertheless, I believe that due process requires that Hoss be given more than a periodical *ipse dixit* pronouncement that he is a "security case." At his monthly reviews, Hoss is entitled to know what good conduct he has exhibited and should build upon to earn release as well as what recent bad conduct is being looked upon by the committee as weighing against release. While Hoss need not be provided with a manual on how to gain BAU discharge, greater guidance than he has had until now is required.

██ I do not believe that the requirement of more frequent expert psychological reports imposes too great an administrative burden on the state correctional system. The state already has a staff of medical personnel presumably capable of performing this function. Although the record does not disclose the size of this staff or the extent of its duties, I note that the amended version of Directive 801, ¶ III.G.4. [to be codified at 37 Pa.Code § 95.103(g)(4)], requires annual psychological and psychiatric examinations, and it is reasonable to assume that the state has available sufficient personnel to accomplish this self-imposed obligation. While the opinions of doctors not associated with the state also would be beneficial, the burden and expense of obtaining such opinions leads me to conclude that, at least on the present record, they are not constitutionally required. I hold that the due process requirement of a meaningful review of Hoss' condition necessitates consideration of periodically updated psychological reports; I shall defer to defendants as to the source of such reports, so long as they are professional.

Most of the cases dealing with this topic have done so in the context of disciplinary imposition of segregation, rather than its imposition for administrative reasons such as security. My conclusions, however, are in accord with the general views of a leading case in the area of administrative segregation, *Kelly v. Brewer, supra*, which concludes:

> "Since there must be a valid and subsisting reason for holding an inmate in segregation, we agree . . . that where an inmate is held in segregation for a prolonged or indefinite period of time due process requires that his situation be reviewed periodically in a meaningful way and by relevant standards to determine whether he should be retained in segregation or returned to population." 525 F.2d at 400.

Since the procedures employed by SCI Graterford with regard to Hoss do not comply with this standard, I conclude that they do not meet constitutional due process requirements. As was the case in *Kelly*, this conclusion derives largely from the fact that a prisoner is being "held in segregation for a prolonged or indefinite period of time." Other fact situations may be subject to different due process requirements, and my holding should not be construed as a blanket pronouncement applicable to every administrative segregation case. Also, of course, this ruling does not mean that defendants may not exercise their discretion to continue Hoss' BAU confinement status; I merely hold that, in doing so, defendants must utilize procedures which provide greater safeguards to Hoss than those presently employed.

In depriving Hoss of liberty without procedural due process of law, defendants have violated 42 U.S.C. § 1983. I shall now consider the relief to which Hoss is entitled for that violation.

### III. *Remedies*

In the complaint, Hoss requested a declaratory judgment, damages, and injunctive relief. I shall discuss each of these remedies in turn.

### A. *Declaratory relief*

██ The Declaratory Judgments Act, 28 U.S.C. § 2201, provides that a federal court "may declare the rights and other legal relations of any interested party seeking such declaration." In this case, Hoss seeks a declaration that defendants have violated his constitutional rights. I have held that, in violation of the Civil Rights Act of 1871, defendants have not afforded Hoss constitutionally adequate procedures for determining whether his BAU confinement should be continued and that they thus have deprived him of his right to procedural due process of law. Hoss is entitled to a judgment making that declaration.

### B. *Damages*

██ In the *pro se* complaint, Hoss sought compensatory and punitive damages against defendants Johnson and Mauger. Although the complaint has been amended to alter the list of named defendants, a conforming amendment has not been made to the damages request. Nevertheless, I shall assume that Hoss is seeking compensatory and punitive damages against all named defendants.

I have held that the BAU confinement evaluation procedures violate due process requirements. After making an independent, objective assessment of the situation, however, I also have held that Hoss' continued confinement to the BAU is reasonable and does not constitute cruel and unusual punishment. It therefore appears that Hoss has not suffered injury as a result of the due process violation, and, at most, he may recover only nominal damages as a result. *See Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978); *Thompson v. Burke,* 556 F.2d 231, 240 (3d Cir. 1977); *United States ex rel. Tyrrell v. Speaker,* 535 F.2d 823, 829–30 (3d Cir. 1976). In addition, my assessment of defendants' conduct with regard to Hoss is such that Hoss would not be entitled to punitive dam-

ages. *See generally Cochetti v. Desmond,* 572 F.2d 102, 105–107 (3d Cir. 1978); *Guzman v. Western State Bank,* 540 F.2d 948, 953–54 (8th Cir. 1976). The controlling consideration on the damages question, however, is immunity. I conclude that no damages whatsoever may be awarded Hoss because defendants are immune from damage liability under the Eleventh Amendment to the Constitution [24] and also by virtue of the common law immunity applicable to governmental officials in civil rights actions.

██ The Eleventh Amendment provides:

"The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

Despite the Amendment's wording, it has been held to confer immunity on states in actions brought by their own citizens. *Edelman v. Jordan,* 415 U.S. 651, 662–63, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). That immunity runs to state officials if they are sued in their official capacity and the state is the real party upon which liability is sought to be imposed, as where the suit is for damages to be paid from the public funds of the state treasury. *Scheuer v. Rhodes,* 416 U.S. 232, 237–38, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Edelman, supra; Ford Motor Co. v. Department of Treasury,* 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945); *Governor of Georgia v. Madrazo,* 26 U.S. (1 Pet.) 110, 7 L.Ed. 73 (1828). The immunity does not extend to autonomous state entities such as municipalities or independent school districts. *See Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 279–81, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

---

**24.** The Eleventh Amendment issue was not raised by defendants, but the Supreme Court has held that it "sufficiently partakes of the nature of a jurisdictional bar so that it need not be raised in the trial court." *Edelman v. Jordan,*

415 U.S. 651, 678, 94 S.Ct. 1347, 1363, 39 L.Ed.2d 662 (1974). Jurisdictional issues may be raised by the court itself. *See* Fed.R.Civ.P. 12(h)(3).

Defendants in this action are sued in their official capacity as state correctional system administrative personnel. They are officers of entities—the Bureau of Correction and SCI Graterford—that are administrative branches of the state itself, rather than autonomous state-created units. *See* Administrative Code of 1929, §§ 201–202, 911–916, 71 Pa.Stat.Ann. §§ 61–62, 301–306 (Purdon); Penal and Correctional ·Institutions Act of 1953, §§ 1–4, 71 Pa.Stat.Ann. §§ 831–834 (Purdon). Hoss thus is seeking to obtain damages from the state itself through its officers, an effort directly forbidden by the Eleventh Amendment. Defendants therefore have Eleventh Amendment immunity from a damage award in this case. *See Jones v. Manson*, 393 F.Supp. 1016, 1021 (D.Conn.1975).

Insofar as Hoss is "seeking to impose individual and personal liability on the *named defendants*" (*Scheuer, supra*, 416 U.S. at 238, 94 S.Ct. at 1687 (emphasis in original)); recovery of damages is precluded by the traditional immunity of governmental officials which has been· extended to civil rights actions from common law. Depending on the functions performed by the official, the common law immunity may be absolute or qualified. I shall assume that only the qualified immunity applies here.[25] Generally, that immunity requires that the governmental official have acted within the scope of his official responsibility and with a reasonable and good faith belief that his actions were not violative of constitutional rights. *Procunier v. Navarette*, 434 U.S. 555, 560–567, 98 S.Ct. 855, 859–62, 55 L.Ed. 2d 24 (1978); *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). I have found that defendants have so acted in this case. The evidence convinces me that, at all relevant times, the defendants,

acting under authority vested in them as state correctional officials, had a reasonable belief that the procedures afforded at SCI Graterford comported with due process requirements and did not have a "malicious intention" (*Wood*, at 322, 95 S.Ct. 992) to deprive Hoss of his rights. Defendants therefore are immune from damage recovery.

## C. *Equitable relief*

The final question is whether Hoss is entitled to injunctive relief providing a prospective remedy for the constitutional violations which have occurred. At the outset, I note that, although the Eleventh Amendment bars the awarding of damages in this case, it does not bar the entry of an injunction having prospective application against the named defendants. Since the Supreme Court's decision in *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), it has been established that such relief may be granted against state officials to remedy constitutional violations. *Scheuer v. Rhodes*, 416 U.S. 232, 237, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *see Milliken v. Bradley*, 433 U.S. 267, 288–90, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977); *Edelman v. Jordan*, 415 U.S. 651, 664, 667–68, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).[26] It also is established that a state prisoner may obtain such relief without first exhausting state administrative remedies. *United States ex rel. Ricketts v. Lightcap*, 567 F.2d 1226 (3d Cir. 1977).

I also note that equitable relief in this case is not barred by the rule of *Preiser v. Rodriguez*, 411 U.S. 475, 93 S.Ct. 1827, 36 Ed.2d 439 (1973), that a prisoner may not obtain an injunction under the 1871 Civil Rights Act if the relief sought is in the nature of that traditionally available by

**25.** Defendants assert that they are entitled to absolute immunity because they perform quasi-judicial functions. I need not and do not rule on that issue. *See generally Imbler v. Pachtman*, 424 U.S. 409, 430–31, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976); *Jennings v. Shuman*, 567 F.2d 1213, 1221–22 (3d Cir. 1977); *Thompson v. Burke*, 556 F.2d 231, 236–40 (3d Cir. 1977); *Helstoski v. Goldstein*, 552 F.2d 564 (3d Cir.

1977); *Raitport v. Provident Nat'l Bank*, 451 F.Supp. 522, 537, 538 (E.D.Pa.1978). *See also Procunier v. Navarette*, 434 U.S. 555, 560, 98 S.Ct. 855, 859, 55 L.Ed.2d 24 (1978).

**26.** Defendants have not contended that their common law immunity from damage liability prevents the award of equitable relief in this case.

means of a writ of habeas corpus. Although Hoss seeks relief from certain conditions of his imprisonment (segregated confinement in the BAU), he does not seek release from imprisonment altogether or shortening of the duration of his imprisonment, and therefore the relief sought is not of the type traditionally available through habeas corpus for purposes of the *Preiser* rule. *See* 411 U.S. at 498–500, 93 S.Ct. 1827; *Wolff v. McDonnell*, 418 U.S. 539, 554–55, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Geraghty v. United States Parole Comm.*, 579 F.2d 238, 244 (3d Cir. 1978).

 The foremost consideration in assessing the propriety of equitable relief in this case is that identified in *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971):

> "In seeking to define even in broad and general terms how far [federal equitable] remedial power extends it is important to remember that judicial powers may be exercised only on the basis of a constitutional violation."

It therefore has been held that "[o]nce a constitutional violation is found, a federal court is required to tailor 'the scope of the remedy' to fit 'the nature and extent of the constitutional violation.'" *Hills v. Gautreaux*, 425 U.S. 284, 293–94, 96 S.Ct. 1538, 1544, 47 L.Ed.2d 792 (1976), quoting *Milliken v. Bradley*, 418 U.S. 717, 744, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974); *accord, Dayton Board of Education v. Brinkman*, 433 U.S. 406, 419–20, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977). In this case, that task requires a special sensitivity, since, as already noted, problems of correctional institutions are matters traditionally preserved from judicial interference in recognition of the fact that "they are not readily susceptible of resolution by decree." *Procunier v. Martinez*, 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974); *see e. g., Ahrens v. Thomas*, 570 F.2d 286, 289–90 (8th Cir. 1978), *rev'g in part* 434 F.Supp. 873, 899–905 (W.D.Mo.1977). *See also Frug, The Judicial Power of the Purse*, 126 U.Pa.L.Rev. 715 (1978). The fact that SCI Graterford is

a state—rather than federal—prison adds an additional reason for caution in this case in deference to considerations of federalism. *Procunier v. Martinez*, 416 U.S. at 405, 94 S.Ct. 1800; *see Rizzo v. Goode*, 423 U.S. 362, 377–80, 96 S.Ct. 598, 608, 46 L.Ed.2d 561 (1976) ("appropriate consideration must be given to principles of federalism in determining the availability and scope of equitable relief" against state or local executive officials); *cf. United States ex rel. Wolfish v. Levi*, 439 F.Supp. 114 (S.D.N.Y.1977) (supervisory authority over federal prisons), *rev'd in part*, 573 F.2d 118 (2d Cir. 1978). Nevertheless, I must adhere to the fundamental policy that "[w]hen a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights." *Procunier v. Martinez*, 416 U.S. at 405–06, 94 S.Ct. at 1808, citing *Johnson v. Avery*, 393 U.S. 483, 486, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969); *see, e. g., Battle v. Anderson*, 564 F.2d 388 (10th Cir. 1977); *Palmigiano v. Garrahy*, 443 F.Supp. 956, 978–79, 984–90 (D.R.I.1977); *Landman v. Royster*, 333 F.Supp. 621 (E.D.Va.1971).

In the *pro se* complaint, Hoss' specific requests for equitable relief fell into three categories. First, he requested an order "[r]equir[ing] defendants to put [him] in general population." Since I have held that Hoss' present confinement to the BAU is not unconstitutional, I cannot enter such an order in view of the equitable policies that have been outlined. Another request was that the Court order implementation of certain rehabilitative programs in the BAU. Implementation of programs beyond those already offered may be worthwhile and advisable, but, again, since I have held that the alleged inadequacy of rehabilitative services does not make BAU confinement cruel and unusual punishment, I cannot order that such programs be implemented. Hoss' remaining requests were for orders protecting maintenance of his lawsuit, including an order prohibiting retaliation against him for filing suit and an order compelling cooperation with the suit by prison authorities. There has been no evidence that, at any time that this case has

been pending, defendants sought to hinder its prosecution in any way or that Hoss is in any danger of retaliatory injury as a result of filing this action; therefore, it is not appropriate to grant this specific relief at this time.

In the *pro se* complaint, Hoss did not request any specific injunctive relief with respect to BAU confinement procedures, but, since I have found those procedures unconstitutional, it is evident that this is the one type of equitable relief which is appropriate in this case. The failure to request such relief in the complaint does not bar granting it. Fed.R.Civ.P. 54(c);[27] *Kahan v. Rosenstiel,* 424 F.2d 161, 174 (3d Cir.), *cert. denied,* 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970). Indeed, throughout the pendency of this action, all parties have recognized that the procedures used at SCI Graterford were a major target of this lawsuit and have understood that an injunction was one of the remedies being sought. I therefore shall enter an injunction designed to remedy the procedural due process violation.

Since the injunction should be tailored to the specific constitutional violation found to exist, the content of the equitable decree should follow the holding on the procedural due process issue. I have held that the BAU confinement procedures are constitutionally inadequate in that the Program Review Committee has not defined the standards and considerations by which the need for Hoss' continued BAU confinement is to be judged, Hoss is not being provided with sufficient information as to why his BAU confinement is being continued and what he must do to gain release from the BAU, and the committee has not obtained sufficient information as to Hoss'

psychological condition to enable it to make an informed decision on Hoss' proper confinement status. The injunction will address each of these procedural deficiencies.

First, defendants will be enjoined to formulate objective criteria for use in determining whether to continue BAU confinement of Hoss. In light of recent submissions to the Court by defense counsel, there seems to be some confusion as to what is meant by objective criteria. Defendants have concluded that it is necessary to segregate from the general population prisoners who are security risks. They also have concluded that Hoss falls within this category. To make this determination with respect to Hoss (or any other prisoner) requires a definition by defendants of what a "security risk" is. I doubt that defendants can formulate one all-inclusive test of whether a person is a threat to security; instead, defendants must agree upon standards by which they can judge whether an inmate fits within this category. For example, they may determine that one indication of a security risk is that psychological reports on the inmate predict that he is more likely to react violently to stressful situations than are other prisoners. They may determine that another indication is that in fact, over a specified period of time, the prisoner has reacted violently rather than calmly and rationally, to stressful situations. Still another indication may be that the prisoner's habitual conduct or language is of the type that can be expected to provoke or instigate stressful, and possibly violent, situations. Defendants also might consider it relevant that specific conduct of the prisoner over a specified period of time has exhibited an attitude of rebellion or

---

**27.** The rule provides:

"Except as to a party against whom a judgment is entered by default, every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings."

Further, since I have held that Hoss is entitled to a declaratory judgment, the second section of the Declaratory Judgments Act, 28 U.S.C. § 2202, is applicable:

"Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment."

*See Edward B. Marks Music Corp. v. Charles K. Harris Music Publ. Co.,* 255 F.2d 518, 522 (2d Cir.), *cert. denied,* 358 U.S. 831, 79 S.Ct. 51, 3 L.Ed.2d 69 (1958); *Alcoa Steamship Co. v. Velez,* 285 F.Supp. 123, 124 (D.P.R.1968).

defiance of prison authority. I cannot over-emphasize that I mention these possibilities merely as examples of objective criteria. It is for defendants, calling upon their expertise, to determine what objective standards are proper, and these examples are not intended to limit or influence their judgment in doing so.[28] The examples, however, do illustrate what is meant by objective criteria. Only after a comprehensive list of objective criteria that a prisoner is a security risk has been formulated may defendants focus on a specific prisoner such as Hoss and, using whatever evidence is available (e. g., counselors' reports, staff observations, Program Review Committee impressions from personal interviews of the inmate, etc.), assess how he stands with respect to these factors and, ultimately, in light of that assessment, whether he poses such a risk to the safety of himself and others that he should be kept segregated.

Second, defendants will be required to furnish to Hoss more meaningful information about the decision to continue his confinement. The standard conclusion that he is a "security case" must be replaced with a more detailed explanation of the factors which have led to the Program Review Committee's decision. Arguably, this requirement already is imposed by ¶ III.G.4. of Administrative Directive No. 801, as amended [to be codified at 37 Pa.Code § 95.103(g)(4)], which states that the inmate must "be given a written statement of the decision and its rationale." Insofar as is possible, the committee must tell Hoss what objective criteria it is using to determine security risk status and how he stands with respect to such factors. As I have already stated, the committee does not have to give Hoss a manual on how to gain BAU discharge, but it must give him as much information as possible about the reasons for its decision to continue his confinement, or, more specifically, why it considers him a security risk.

Finally, defendants will be enjoined to obtain and use periodical psychological evaluations of Hoss. The professional reports may be from doctors employed by the state or from outside sources. The record is not sufficient to establish the frequency with which the evaluations should be required, but ¶ III.G.4. of the amended Directive mandates annual examinations and this appears to be a reasonable frequency in light of the type of evaluation to be made, the importance of the information to the determination of Hoss' status, and the burden that would be entailed by more frequent examinations. Although annual examinations may approach the constitutional minimum, the evidence does not support a more frequent examination requirement for this case, and therefore only annual examinations will be ordered at this time. This does not preclude more frequent psychological evaluations should a need for them be manifested.

Operation of a prison is a task committed to correctional officers and administrators, not judges. In formulating the content of this injunction, I defer to state administrative officials in the first instance to decide, *inter alia,* what criteria should be used in determining Hoss' confinement status, what specific information should be given to Hoss, and how much weight should be given to professional psychological evaluations. This degree of federal judicial interference is the minimum necessary to protect Hoss' rights.

Defendants will be ordered to begin complying with the Court's directive without delay. Formulation of the objective criteria must be completed and filed with the Court within thirty days, and objections to these criteria, if any, must be made by Hoss within the following two weeks. Furnishing of more detailed information to Hoss must begin with the report of the next regularly scheduled Program Review Committee evaluation following promulgation of the objective criteria. A psychological

---

**28.** They also should not be viewed as an advisory declaration of what standards would be held sufficient if they were later judicially challenged. The examples are intended as illustrative only.

examination of Hoss must be conducted not later than one year after his last examination—*i. e.,* by August 1978, if the Sadoff and Rundle examinations are the last Hoss has had.

## CONCLUSIONS OF LAW

1. This is an action under the Civil Rights Act of 1871, 42 U.S.C. §§ 1983, 1985. The Court has jurisdiction under 28 U.S.C. § 1343.

2. None of the defendants in this action conspired to interfere with the duties of federal officials, interfere with federal court proceedings, obstruct justice in a state or territory with the intent to deny equal protection rights, directly or indirectly infringe equal protection rights, or interfere with federal voting rights. Each of the defendants therefore is entitled to judgment absolving him from liability under 42 U.S.C. § 1985.

3. At all times pertinent to this case, each of the defendants acted in his official capacity under color of the laws of the Commonwealth of Pennsylvania.

4. Hoss has been confined to the BAU at SCI Graterford for administrative (rather than punitive or disciplinary) reasons. Throughout the period of his incarceration at SCI Graterford there has been a reasonable basis for confining Hoss to the BAU as a security risk, and the BAU confinement therefore did not subject Hoss to cruel and unusual punishment. The physical condition of Hoss' BAU cell and the sufficiency of the programs and facilities provided Hoss in the BAU are not so far below contemporary standards of decency as to subject Hoss to cruel and unusual punishment.

5. By virtue of Administrative Directive No. 801, SCI Graterford inmates, including Hoss, have a liberty interest in freedom from segregated confinement in the BAU. Throughout the period of his incarceration at SCI Graterford, Hoss has been deprived of this liberty. The procedures employed at SCI Graterford to determine whether this deprivation of Hoss' liberty should be continued fail to comport with procedural due process requirements in that no criteria have been formulated by which to judge the need for Hoss' continued BAU confinement; Hoss is not sufficiently informed as to the reasons for his continued BAU confinement; and, although the decision to maintain such confinement is based on an analysis of Hoss' violent propensities, the decision is made without sufficient psychological data about Hoss. Because the decision to continue deprivation of Hoss' liberty has had a reasonable relation to attainment of a legitimate governmental objective, Hoss has not been deprived of substantive due process.

6. By depriving Hoss of liberty without procedural due process of law while acting under color of state law, defendants have violated the Civil Rights Act of 1871, 42 U.S.C. § 1983.

7. Hoss is entitled to a judgment declaring that defendants deprived him of liberty without procedural due process of law in violation of the Fourteenth Amendment to the Constitution and that, in doing so, defendants violated the Civil Rights Act of 1871, 42 U.S.C. § 1983.

8. Hoss is not entitled to the award of compensatory or punitive damages. Defendants acted in their official capacities as administrative officers of Pennsylvania agencies and therefore are immune from damage liability under the Eleventh Amendment. In addition, defendants are immune from damage liability because they acted in a reasonable, good faith belief that their conduct was within the scope of their authority and was constitutional.

9. Hoss is entitled to a permanent injunction remedying the constitutional defects in BAU confinement procedures specified in this opinion.